UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert B. Kugler, U.S.D.J. |
| | : | |
| v. | : | |
| | : | Crim. No. 20-800 (RBK) |
| CHRISTOPHER KYLE JOHNSTON, | : | |
| TRENT BROCKMEIER, and | | |
| CHRISTOPHER CASSERI | | |

---

**BRIEF OF THE UNITED STATES IN OPPOSITION TO
DEFENDANTS PRETRIAL MOTIONS**

---

VIKAS KHANNA
**Attorney for the United States**
401 Market Street
Camden, New Jersey 08101
(856) 757-5026

<u>On the Memorandum</u>:
R. David Walk, Jr.
Daniel A. Friedman
Assistant United States Attorneys

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

PRELIMINARY STATEMENT .................................................................... 1

ARGUMENT ................................................................................................ 1

I.   COUNT 1 STATES AN OFFENSE. ................................................... 1

II.  COUNT 1 IS NOT VOID FOR VAGUENESS. .................................. 5

    A.  The Court Should Reject the Argument that Count 1 Must Be
        Dismissed On the Ground that the Indictment and Charged Statutes
        Do Not Define "Medical Necessity." ...............................................6

    B.  The Indictment's Allegations Regarding Test Adjudications and
        Preprinted Prescription Pads Do Not Render Count 1 Defective. ........ 13

III. COUNT 2 STATES A CLAIM AND IS NOT UNCONSTITUTIONALLY
    VAGUE. .......................................................................................... 16

    A.  *Dubin* Was Unique to the Aggravated Identity Theft Statute (18 U.S.C.
        § 1028A) and Does Not Apply to the Different Statute Charged in
        Count 2 of the Indictment (18 U.S.C. § 1028(a)(7)). .................................17

        1.  *Title* .......................................................................................... 19

        2.  *Context & Policy* .........................................................................20

        3.  *Surrounding Text* ....................................................................... 22

    B.  Even Under *Dubin*'s Standard, Count 2 States a Claim. .................... 24

    C.  18 U.S.C. § 1028(a)(7) Is Not Unconstitutionally Vague. .................... 29

IV.  COUNT 1 AND COUNT 2 ARE NOT MULTIPLICITOUS. ........................... 31

    A.  Applicable Law ................................................................................... 32

    B.  Count 1 and Count 2 Are Not Multiplicitous. ........................................ 33

    C.  The "Liotard" Test is Inapplicable. ........................................................ 37

    D.  A Multiplicity Claim is Not Amenable to a Ruling on a Motion to
        Dismiss ............................................................................................. 40

V.   COUNT 3 IS NOT DUPLICITOUS. ................................................. 41

VI.  THE MONEY LAUNDERING CONSPIRACY AND MONEY LAUNDERING
    COUNTS STATE AN OFFENSE. .................................................... 43

VII.    THE INDICTMENT ALLEGES CONDUCT IN NEW JERSEY AND SHOULD NOT BE DISMISSED FOR LACK OF VENUE. ............................ 52

    A.    Count 1 ............................................................................................ 53

    B.    Count 2 ............................................................................................ 56

    C.    Count 3 ............................................................................................ 57

    D.    Count 4 ............................................................................................ 59

    E.    Counts 5-24 ..................................................................................... 61

VIII.    THE ALLEGATION THAT DEFENDANT JOHNSTON RECEIVED $34,000,000 FROM HIS CRIMINAL CONDUCT IS NOT SURPLUSAGE. ... 62

IX. DEFENDANTS' REQUEST FOR A BILL OF PARTICULARS SHOULD BE DENIED BECAUSE THE DEFENDANTS HAVE RECEIVED A DETAILED INDICTMENT AND EXTENSIVE DISCOVERY. .......................................... 64

    A.    A Bill of Particulars is Unwarranted Because the Indictment and Discovery Give the Defendants Ample Information. ............................ 64

    B.    Defendants' Individual Requests ............................................................ 70

        1.    Each and every act Defendant Johnston took ................................... 70

        2.    Identity of unindicted co-conspirators ............................................. 71

        3.    Location of events ................................................................. 73

        4.    Other evidentiary details ................................................................. 73

X.  THE DEFENDANTS SHOULD BE ORDERED TO PRODUCE RECIPROCAL DISCOVERY AND PRIOR DEFENSE WITNESS STATEMENTS. ............................................................................................... 75

**CONCLUSION** ......................................................................................... 76

# <u>TABLE OF AUTHORITIES</u>

*Albernaz v. United States,*
    450 U.S. 333 (1981) ................................................................................ 38

*Blockburger v. United States,*
    284 U.S. 299 (1932) ................................................................................ 32

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952) ................................................................................ 12

*Corley v. United States,*
    556 U.S. 303 (2009) ................................................................................ 23

*Doe v. Mercy Cath. Med. Ctr.,*
    850 F.3d 545 (3d Cir. 2017) ................................................................... 23

*Dubin v. United States,*
    599 U.S. 110 (2023) .......................................................................... *passim*

*Garrett v. United States,*
    471 U.S. 773 (1985) ................................................................................ 36

*Giaccio v. Penn.,*
    382 U.S. 399 (1966) .................................................................................. 7

*Hamling v. United States,*
    418 U.S. 87 (1974) ................................................................................ 1-2

*Hibbs v. Winn,*
    542 U.S. 88 (2004) .................................................................................. 23

*Jones v. Thomas,*
    491 U.S. 376 (1989) ................................................................................ 40

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) .................................................................................. 6

*Pugin v. Garland,*
    599 U.S. 600 (2023) ................................................................................ 24

*Sanabria v. United States,*
    437 U.S. 54 (1978) .............................................................................. 38-39

*Screws v. United States,*
    325 U.S. 91 (1945) .................................................................................. 12

*Shular v. United States,*
   140 S. Ct. 779 (2020) ................................................................................ 24

*Skilling v. United States,*
   561 U.S. 358 (2010) ..................................................................................... 7

*Smith v. Goguen,*
   415 U.S. 566 (1974) ..................................................................................... 7

*United States v. Evans Concrete, LLC,*
   2023 WL 3019058 (S.D. Ga. Apr. 20, 2023) ........................................... 42

*United States v. Addonizio,*
   451 F.2d 49 (3d Cir. 1971) ........................................................................ 65

*United States v. Akande,*
   2018 WL 3318877 (E.D. Ky. July 3, 2018) ...................................... 10-12

*United States v. Alsugair,*
   295 F. Supp.2d 306 (D.N.J. 2003) ............................................................ 62

*United States v. Aprahamian,*
   2022 WL 221615 (E.D. Pa. Jan. 25, 2022) .............................................. 59

*United States v. Armocida,*
   515 F.2d 49 (3d Cir. 1975) ........................................................................ 74

*United States v. Atwell,*
   2015 WL 2092687 (D.N.J. May 5, 2015) ................................................ 72

*United States v. Auernheimer,*
   748 F.3d 525 (3d Cir. 2014) ...................................................................... 55

*United States v. Ayala,*
   917 F.3d 752 (3d Cir. 2019) ...................................................................... 35

*United States v. Bellomo,*
   263 F. Supp. 2d 561 (E.D.N.Y. 2003) ...................................................... 65

*United States v. Besmajian,*
   910 F.2d 1153 (3d Cir. 1990) ..................................................................... 2

*United States v. Bortnick,*
   2004 WL 2861868 (E.D. Pa. Nov. 30, 2004) ........................................... 63

*United States v. Brassington,*
   2010 WL 3982036 (D.N.J. Oct. 8, 2010) .................................................. 59

*United States v. Brennan,*
    452 F.Supp.3d 225 (E.D. Pa. 2020) ................................................ 59

*United States v. Butler,*
    211 F.3d 826 (4th Cir. 2000) ...................................................... 50

*United States v Carter,*
    576 F.2d 1061 (3d Cir. 1978) ..................................................... 32

*United States v. Caruso,*
    948 F. Supp. 382 (D.N.J. 1996) ................................................. 67

*United States v. Chartock,*
    283 F. App'x 948–57 (3d Cir. 2008) ........................................... 47

*United States v. Coffey,*
    361 F. Supp. 2d 102 (E.D.N.Y. 2005) ........................................ 72

*United States v. Conley,*
    37 F.3d 970 (3d Cir. 1994) .................................................. 46, 51

*United States v. Cook,*
    2018 WL 1744682 (M.D. Pa. April 11, 2018) ............................... 72

*United States v. Cordero,*
    668 F.2d 32 (1st Cir. 1981) ...................................................... 59

*United States v. Crabb,*
    2008 WL 794871 (M.D. Pa. Mar. 24, 2008) ................................. 69

*United States v. Craigue,*
    565 F. Supp. 3d 267 (D.N.H. 2021) ........................................... 42

*United States v. Crisci,*
    273 F.3d 235 (2d Cir. 2001) ................................................ 41, 42

*United States v. DeLaurentis,*
    230 F.3d 659 (3d Cir. 2000) ................................................ 27, 3

*United States v. Delle Donna,*
    552 F. Supp. 2d 475 (D.N.J. 2008) ..................................... 70, 72, 73

*United States v. Depiro,*
    2013 WL 663303 (D.N.J. Feb. 20, 2013) ............................... 72, 73

*United States v. Dilworth,*
    2011 WL 6179278 (D.N.J. Dec. 12, 2011) ................................... 42

*United States v. Eisenberg,*
    773 F. Supp. 662 (D.N.J. 1991) ............................................................ 63

*United States v. Eufrasio,*
    935 F.2d 553 (3d Cir. 1991) ................................................................. 65

*United States v. Fallon,*
    61 F.4th 95 (3d Cir. 2023) ......................................................... 44, 47-50

*United States v. Fernandez,*
    389 F. App'x. 194 (3d Cir. 2010) ........................................................... 42

*United States v. Finch,*
    2010 WL 3938176 (D. Haw. Sept. 30, 2010) ...................................... 51

*United States v. Franklin-El,*
    54 F.3d 903 (10th Cir. 2009) ............................................ 9, 10, 11, 12

*United States v. Fumo,*
    2008 WL 1731911 (E.D. Pa. Apr. 10, 2008) ........................................ 39

*United States v. Galindo, No. 11-10117-EFM,*
    2012 WL 1945142 (D. Kan. May 30, 2012) ......................................... 35

*United States v. Garcia,*
    2022 WL 1535378 (N.D. Ill. May 16, 2022) .......................................... 9

*United States v. Garcia,*
    2024 WL 170780 (W.D. Tex. Jan. 12, 2024) ................................... 23-24

*United States v. Georgiou,*
    2009 WL 4641719 (E.D. Pa. Dec. 7, 2009) ........................................... 5

*United States v. Gladden,*
    78 F.4th 1232 (11th Cir. 2023) .............................................. 26, 27, 28

*United States v. Golden,*
    2023 WL 2446899 (3d Cir. Mar. 10, 2023) .......................................... 40

*United States v. Haddy,*
    134 F.3d 542 (3d Cir. 1998) ................................................................. 41

*United States v. Hanna,*
    198 F. Supp.2d 236 (E.D.N.Y. 2002) ................................................... 63

*United States v. Hedgepeth,*
    434 F.3d 609 (3d Cir. 2006) ................................................................. 62

*United States v. Herman,*
  2018 WL 4901168 (C.D. Ill. Oct. 9, 2018) ........................................... 42

*United States v. Hodge,*
  211 F.3d 74, 78 (3d Cir. 2000) ................................................... 32, 40

*United States v. Hoffert,*
  949 F.3d 782 (3d Cir. 2020) ................................................. 6, 11, 29

*United States v. Irving,*
  316 F. Supp. 3d 879 (E.D. Pa. 2018) ................................................ 39

*United States v. Jabali,*
  2003 WL 22170595 (E.D.N.Y. Sept. 12, 2003) .................................. 73

*United States v. Janati,*
  237 F. App'x 843 (4th Cir. 2007) ............................................... 10, 12

*United States v. John-Baptiste,*
  747 F.3d 186 (3d Cir. 2014) ......................................................... 6

*United States v. Kemp,*
  500 F.3d 257 (3d Cir. 2007) ..................................................... 1, 2

*United States v. Kemp,*
  2004 WL 2757867 (E.D. Pa. Dec. 2, 2004) ..................................... 67

*United States v. Kennedy,*
  682 F.3d 244 (3d Cir. 2012) ...................................................... 32

*United States v. Kennedy,*
  707 F.3d 558 (5th Cir. 2013) ................................................ 46, 47, 51

*United States v. Kenny,*
  462 F.2d 1205 (3d Cir. 1972) ............................................. 65, 66, 73

*United States v. Knight,*
  2013 WL 3367259 (E.D. Pa. July 3, 2013) .................................. 70, 72

*United States v. Komolafe,*
  246 F. App'x 806 (3d Cir. 2007) .................................................. 36

*United States v. Koranki,*
  2010 WL 2868183 (W.D. Okla. July 20, 2010) .................................. 63

*United States v. Lacerda,*
  2013 WL 3177814 at *14 (D.N.J. June 19, 2013) ........................... 67, 70

*United States v. LaCost*,
    2010 WL 3522334 (C.D. Ill. Sept. 2, 2010) ........................................................ 51

*United States v. Lallande*,
    2023 WL 5035317 (D.N.J. Aug. 8, 2023) ................................................ 53, 56, 57

*United States v. Lange*,
    834 F.3d 58 (2d Cir. 2016) ........................................................................ 56

*United States v. Lavin*,
    504 F. Supp. 1356 (N.D. Ill. 1981) ........................................................ 64

*United States v. Lievertz*,
    2002 WL 31640562 (S.D. Ind. Nov. 1, 2002) ........................................................ 9

*United States v. Liotard*,
    817 F.2d 1074 (3d Cir. 1978) ........................................................ 37-39

*United States v. Lovett*,
    964 F.2d 1029 (10th Cir. 1992) ........................................................ 50

*United States v. Mariani*,
    7 F. Supp. 2d 556 (M.D. Pa. 1998) ........................................................ 72

*United States v. McCafferty*,
    2011 WL 933771 (N.D. Ohio Mar. 16, 2011) ........................................................ 42

*United States v. McGill*,
    2016 WL 8716240 (E.D. Pa. May 13, 2016) ........................................................ 11

*United States v. Med 1st*,
    2017 WL 4848823 (W.D. Ky. Oct. 26, 2017) ........................................................ 9

*United States v. Menendez*,
    137 F. Supp. 3d 688 (D.N.J. 2015) ........................................................ 52-53, 53

*United States v. Mitchell*,
    652 F.3d 387. (3d Cir. 2011) ........................................................ 29-30

*United States v. Moyer*,
    674 F.3d 192 (3d Cir. 2012) ........................................................ 66

*United States v. Nat'l Dairy Prod. Corp.*,
    372 U.S. 29 (1963) ........................................................ 7

*United States v. Omoruyi*,
    260 F.3d 291 (3d Cir. 2001) ........................................................ 46, 50

*United States v. Perez*,
    280 F.3d 318 (3d Cir. 2002) ......................................................... 54, 55

*United States v. Piervinanzi*,
    23 F.3d 670 (2d Cir. 1994) ................................................................ 50

*United States v. Pollen*,
    978 F.2d at 78 (3d Cir. 1992) .............................................................. 40

*United States v. Qayyum*,
    1998 WL 159056 (S.D.N.Y. Apr. 1, 1998) ..................................... 70-71

*United States v. Rankin*,
    870 F.2d 109 (3d Cir. 1989) ................................................................. 2

*United States v. Renteria*,
    903 F.3d 326 (3d Cir. 2018) ............................................................... 58

*United States v. Renzi*,
    2012 WL 1029571 (D. Ariz. Mar. 27, 2012) ................................... 51, 52

*United States v. Resendiz-Ponce*,
    549 U.S. 102 (2007) ........................................................................... 2

*United States v. Richardson*,
    658 F.3d. 333 (3d Cir. 2011) .............................................................. 49

*United States v. Rigas*,
    565 F. Supp. 2d 620–34 (M.D. Pa. 2008) ........................................... 38

*United States v. Rigas*,
    605 F.3d 194 (3d Cir. 2010) ................................................... 32, 38, 39

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2008) ........................................................... 58-59

*United States v. Rosa*,
    891 F.2d 1063 (3d Cir. 1989) ........................................................ 65, 69

*United States v. Rush*,
    807 F. Supp. 1263 (E.D. La. 1992) ................................................ 63, 64

*United States v. Salahmand*,
    2009 WL 10680619 (D.D.C. May 12, 2009) ...................................... 36

*United States v. Salerno*,
    481 U.S. 739 (1987) ......................................................................... 30

*United States v. Sampson,*
    2012 WL 214707 (M.D. Pa. Jan. 24, 2012) ........................................................ 72

*United States v. Santurtan-Teran,*
    2021 WL 2371231 (M.D. Pa. June 9, 2021) ...................................................... 59

*United States v. Savage,*
    2012 WL 1994736 (E.D. Pa. June 1, 2012) ...................................................... 39

*United States v. Schwening,*
    2006 WL 1559668 (D. Neb. June 5, 2006) ...................................................... 63

*United States v. Shoss,*
    523 F. App'x 713 (11th Cir. 2013) .................................................................. 53

*United States v. Smith,*
    82 F.3d 1261 (3d Cir. 1996) ........................................................................... 37

*United States v. Smith,*
    776 F.2d 1104 (3d Cir. 1985) ................................................................ 65, 69

*United States v. Smukler,*
    330 F. Supp. 3d 1050 (E.D. Pa. 2018) ............................................................ 71

*United States v. Sourlis,*
    953 F. Supp. 568 (D.N.J. 1996) .............................................................. 41, 70

*United States v. Stephenson,*
    895 F.2d 867 (2d Cir. 1990) ........................................................................... 58

*United States v. Thomley,*
    2018 WL 6492955 (S.D. Miss. Dec. 10, 2018) ................................................ 15

*United States v. Travillion,*
    759 F.3d 281 (3d Cir. 2014) ........................................................................... 39

*United States v. Urban,*
    404 F.3d 754 (3d Cir. 2005) ................................................................ 64, 65, 67

*United States v. Vitillo,*
    490 F.3d 314 (3d Cir. 2007) ............................................................................. 2

*United States v. Wabo,*
    290 F. Supp. 2d 486 (D.N.J. 2003) ................................................................ 69

*United States v. Werme,*
    939 F.2d 108 (3d Cir. 1991) ................................................................... 3, 4, 5

*United States v. Williams,*
   553 U.S. 285 (2008) .................................................................. 7

*United States v. Willis,*
   844 F.3d 155 (3d Cir. 2016) .................................................... 2

*United States v. Zolp,*
   659 F. Supp. 692 (D.N.J. 1987) ...................................... 65, 69

*Whitfield v. United States,*
   543 U.S. 209 (2005) ........................................................ 54, 60

## Statutes

18 U.S.C. § 371 ............................................ 36, 37, 38, 39, 56

18 U.S.C. § 1001 ....................................................................... 41

18 U.S.C. § 1028 .................................... 16, 18, 19, 29, 30, 31, 36

18 U.S.C. § 1028A ......................................... 16, 17, 18, 30

18 U.S.C. § 1343 ............................................... 7, 21-22, 36

18 U.S.C. § 1347 .......................................... 3, 7-11, 21, 36

18 U.S.C. § 1349 ..................................... 3, 5, 6, 36, 39, 56

18 U.S.C. § 1951 ...................................................................... 22

18 U.S.C. § 1956 ................................................. 43, 48, 49

18 U.S.C. § 1957 ........................................... 22, 43, 44, 49

18 U.S.C. § 3237 ...................................................................... 54

21 U.S.C §§ 846 ...................................................................... 38

## Rules

Fed. R. Crim. P. 7 .............................................. 1, 41, 74

Fed. R. Crim. P. 12 ................................................... 2, 3

Fed. R. Crim. P. 16 ............................................... 75, 76

Fed. R. Crim. P. 26.2 ...................................................... 76

Fed. R. Crim. P. 29 .................................................... 3, 27

## PRELIMINARY STATEMENT

In advance of trial, defendants bring a variety of motions to dismiss certain counts of the Indictment, for a bill of particulars, and for other relief. *See* Dkts. 118-127. For the reasons that follow, defendants' motions should be denied. Additionally, the Government is entitled to reciprocal discovery and statements of potential defense witnesses. The Government thus requests that the defendants produce reciprocal discovery immediately and any statements of potential witnesses at the time of *Jencks* disclosures.

## ARGUMENT

### I.   COUNT 1 STATES AN OFFENSE.

Defendant Casseri, joined by the other defendants, claims that Count 1 of the Indictment fails adequately to state an offense. Dkt. 120. Because Count 1 tracks the language of the statute and pleads facts that, if proven at trial, would violate that statute, Defendant Casseri's motion should be denied.

An indictment must contain only a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient so long as it

> (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

*United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (rejecting multiple challenges to the sufficiency of an indictment charging honest services fraud) (internal citations omitted); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974) (similar standard

1

under Constitutional requirements); *United States v. Rankin*, 870 F.2d 109, 112 (3d

Cir. 1989).  No greater specificity than the statutory language is required so long as

there is sufficient factual orientation to permit the defendant to prepare his defense

and to invoke double jeopardy in the event of a subsequent prosecution.  *Kemp*, 500

F.3d at 280.  As the Supreme Court has explained:

> [T]he Federal Rules were designed to eliminate technicalities in criminal
> pleadings and are to be construed to secure simplicity in procedure.  While
> detailed allegations might well have been required under common-law
> pleading rules, they surely are not contemplated by [Federal Rule of
> Criminal Procedure] 7(c)(1).

*United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (citations and internal

quotation marks omitted).

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a defendant to move to

dismiss an indictment for "failure to state an offense."  But as the Third Circuit has

recognized, "'[a]n indictment returned by a legally constituted and unbiased grand

jury, like an information drawn by the prosecutor, if valid on its face, is enough to call

for trial of the charge on the merits.'"  *United States v. Vitillo*, 490 F.3d 314, 320 (3d

Cir. 2007) (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956) (footnote

omitted)).  For purposes of Rule 12(b)(3)(B), a district court must "accept[] as true the

factual allegations set forth in the indictment."  *United States v. Besmajian*, 910 F.2d

1153, 1154 (3d Cir. 1990).  The "sufficiency of the indictment should be decided based

on the facts alleged within the four corners of the indictment, not the evidence outside

of it."  *Vitillo*, 490 F.3d at 321.  An indictment is sufficient "unless it is so defective

that it does not, by any reasonable construction, charge an offense."  *United States v.*

*Willis*, 844 F.3d 155, 162 (3d Cir. 2016).  Thus, a motion to dismiss is not an

appropriate vehicle to challenge the sufficiency of the government's evidence, but only to challenge the legal sufficiency of the government's allegations.  *See United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000); *see also* Fed. R. Crim. P. 12(b)(2) (limiting pretrial motions to those "that the court can determine without a trial of the general issue").  "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *DeLaurentis*, 230 F.3d at 661.

Count 1 does what *Kemp* requires:  it tracks the statutory language of the health care and wire fraud conspiracy statute, 18 U.S.C. § 1349, and the statutory language of the two object statutes, 18 U.S.C. §§ 1347 and 1343.  Count 1 also includes ample factual detail to enable Casseri to understand the charge and prepare his defense.  Nothing more is required.

Casseri alleges that materiality is an element of the object offense of health care fraud and that Count 1 fails to allege materiality.  He is wrong on both counts. Materiality is not a specific element of 18 U.S.C. § 1347.  *See* 3d Cir. Model Jury Instruction 6.18.137; *see also* Jury Instructions, *United States v. Kaival Patel*, Crim. No. 22-35, Dkt. 94, at 31-32.  Besides, Casseri concedes that "[t]o be legally sufficient, a conspiracy count in an indictment need only set forth the agreement and specific intent to commit an unlawful act." *United States v. Werme*, 939 F.2d 108, 112 (3d Cir. 1991) (internal quotation marks and citation omitted).  "A conspiracy indictment need not allege every element of the underlying offense, but need only put defendants on notice that they are being charged with a conspiracy to commit the underlying substantive offense." *Id.*  Count 1 of the Indictment plainly does that.  Paragraph 13

3

specifically alleges that Defendants agreed to "knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347."

Moreover, just like in *Werme*, "the paragraphs set forth in [Count 1] (which are considered part of the 'charging language,') clearly reveal" that the defendants are charged with conspiracy to commit health care fraud and wire fraud and include allegations of material misrepresentations. *Werme*, 939 F.2d at 112 n.1. For example, paragraphs 8 and 9 state that Pharmacy Benefits Administrator would pay only claims based on "actual valid prescriptions signed or properly authorized by a doctor," which establishes that the validity of prescriptions was material to the PBA. Count 1 alleges that Defendants conspired to cause the submission of false and fraudulent claims for medically unnecessary prescriptions to the PBA. *Id.* ¶ 14. Count 1 then alleges numerous ways in which the conspirators caused the submission of claims that were materially false and fraudulent, including claims (a) for drugs prepared to obtain the highest reimbursement rather than serve the patients' medical needs, (b) without a supporting prescription, (c) for patients who had not been examined by a doctor, (d) for medically unnecessary prescriptions, (e) for prescriptions obtained by kickbacks to doctors and patients, and (f) for drugs falsely promoted as treating medical conditions. *Id.* ¶¶ 24-26, 29-30, 34-36. Although materiality is not specifically required to be

4

alleged in the Indictment, Count 1 has ample allegations of materially false representations, not simply a "bare statutory citation." *Werme*, 939 F.2d at 112 n.1.

Defendant Casseri also argues that an element of the object offense of wire fraud is that the defendant acted knowingly and willfully and that Count 1 fails to include such an allegation. Once again, he is wrong on both counts. Acting "knowingly" is an element of wire fraud but acting "willfully" is not. *See* 3d Cir. Model Jury Instruction 6.18.1343; *see also* Jury Instructions, *United States v. Kaival Patel*, Crim. No. 22-35, Dkt. 94, at 26-27. Paragraph 13 of Count 1—which applies to both objects of the conspiracy (health care fraud and wire fraud)— alleges that Casseri acted "knowingly and intentionally." Paragraph 13.b, which is the subparagraph alleging a conspiracy to commit wire fraud, further alleges that the defendants conspired and agreed to "devise a scheme and artifice to defraud," which necessarily alleges the defendant acted knowingly, because one cannot unknowingly devise a scheme to defraud. *United States v. Georgiou*, 2009 WL 4641719, at *7 (E.D. Pa. Dec. 7, 2009). Count 1 then outlines facts that, if proven, would establish that he committed the charged conspiracy. Nothing more is required. Defendant Casseri's motion to dismiss Count 1 for failure to state an offense should be denied.

## II.        COUNT 1 IS NOT VOID FOR VAGUENESS.

Defendant Johnston, joined by defendants Brockmeier and Casseri, argues that Count 1, which charges conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, is unconstitutionally vague because the wire fraud and health care fraud statutes do not provide notice that medically unnecessary prescriptions are fraudulent, and neither the statutes, nor other statutes or

regulations, define "medical necessity."  Dkt. 126-1 at 22-27.  Defendant Johnston also

asserts that Count 1 should be dismissed because the defendants were not on notice

that using patient information to submit claims for nonexistent prescription to health

insurance companies and using preprinted prescription pads could be part of conduct

that violates federal health care fraud statutes.  *Id.* at 27-29.

> ### A.  The Court Should Reject the Argument that Count 1 Must Be Dismissed On the Ground that the Indictment and Charged Statutes Do Not Define "Medical Necessity."

Defendant Johnston claims that Count 1 is void for vagueness because it alleges

that he conspired to cause healthcare insurers to pay the conspirators for medications

that were not "medically necessary," and there is no established meaning of that term.

Dkt. 126-1 at 22-27.  This claim fails.  The absence in federal law of a universal

definition for "medical necessity" does not render the charge void for vagueness.

A statute is unconstitutionally vague if it "fails to give a person of ordinary

intelligence fair notice that his contemplated conduct is forbidden by the statute" or

"encourages arbitrary and erratic arrests and convictions."  *Papachristou v. City of

Jacksonville*, 405 U.S. 156, 162 (1972); *see also United States v. Hoffert*, 949 F.3d 782,

788 (3d Cir. 2020) (a due process violation arises only if "a criminal statute on which

the conviction is based . . . is so standardless that it authorizes or encourages seriously

discriminatory enforcement.").  "A statute can be void for vagueness not only on its

face, but as applied, as a result of an unforeseeable and retroactive judicial expansion

of narrow and precise statutory language."  *United States v. John-Baptiste*, 747 F.3d

186, 200 (3d Cir. 2014) (cleaned up).  "It is established that a law fails to meet the

requirements of the due process clause if it is so vague and standardless that it leaves

judges or juries free to decide, without legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Penn.*, 382 U.S. 399, 403 (1966).

The void for vagueness doctrine is narrow. A statute is not void for vagueness simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). Rather, a statute is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 33 (1963).

Count 1 of the Indictment accords with due process and is not void for vagueness. The statutes that are the objects of the dual-object conspiracy are wire fraud (18 U.S.C. § 1343) and health care fraud (18 U.S.C. § 1347). The wire fraud statute makes it unlawful to "devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce." 18 U.S.C. § 1343. The health care fraud statute makes it unlawful to "knowingly and willfully execute[] . . . a scheme or artifice . . . to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of

7

the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347. Both statutes give fair warning that obtaining money through fraudulent representations is criminal, and that is precisely what the Indictment charges.

Count 1 sets out in considerable detail the scheme by which the defendants obtained money through fraudulent representations. Through 41 paragraphs, Count 1 details how the defendants executed their scheme to defraud health care benefit programs by developing formulas for compound medications based on the amount insurance companies would pay for ingredients—not which ingredients would benefit the patients—and claiming, without any factual basis, that those medications could treat certain conditions. Count 1 further states that defendants had distributors obtain completed prescriptions that were fraudulent in numerous ways, such as that doctors never saw the patients or never determined the patients needed the medication, and that doctors and patients were paid for writing or receiving prescriptions. Count 1 states that the defendants induced the submission of these fraudulent prescriptions, which they filled and billed insurance companies for. The Indictment lays out in detail a straightforward fraud scheme that an ordinary person would know was unlawful. No definition of "medical necessity" is required because the Indictment sufficiently sets forth the health care fraud charges. Thus, the defendants' motion on these grounds should be denied.

Federal courts have repeatedly rejected motions to dismiss indictments for lack of proof or definition of medical necessity. For example, in *United States v. McLean*, the Fourth Circuit rejected the defendant's argument that the health care fraud

statute, 18 U.S.C. § 1347, was unconstitutionally vague as applied to him because "no clear standard of medical necessity governed the use of coronary artery stents during the relevant time period." 715 F.3d 129, 136 (4th Cir. 2013). The Fourth Circuit "disagree[d]" with the contention that the lack of a government standard or professional guideline left him with "no way of knowing in advance whether his conduct was prohibited." *Id.* As the court noted, "[t]he health care fraud statute is not a medical malpractice statute, it is a simple fraud statute. As applied here, it prohibited McLean from knowingly and willfully defrauding insurers by falsely certifying that the stents he placed in arteries with little to no blockage were reasonable and medically necessary in order to obtain reimbursement. Although the statute does not enumerate every possible fraud scheme, an average person would understand that this kind of conduct is prohibited." *Id.* at 136-37; *see also United States v. Med 1st*, 2017 WL 4848823, at *2 (W.D. Ky. Oct. 26, 2017) ("This Court likewise declines to find that the health care fraud statutes, *see* 18 U.S.C. §§ 1347, 1349, are unconstitutionally vague or violate the Due Process Clause" and rejecting argument that indictment must be dismissed because government cannot prove that procedures were medically unnecessary and therefore fraudulent); *United States v. Lievertz*, 2002 WL 31640562, at *3 (S.D. Ind. Nov. 1, 2002) (rejecting vagueness challenge to 18 U.S.C. § 1347 and 21 U.S.C. § 841(a)(1) prosecution on the ground that a reasonable physician could not determine what actions are "not medically necessary"); *United States v. Garcia*, 2022 WL 1535378, at *1 (N.D. Ill. May 16, 2022) (vagueness challenge to indictment that did not define "what is medically necessary" was "frivolous"). *See generally United States v. Franklin-El*, 54 F.3d 903, 910-11 (10th

Cir. 2009) (rejecting as-applied vagueness challenge to 18 U.S.C. § 1347 because "a person of ordinary intelligence would understand" obtaining Medicaid benefits through misrepresentations to be covered by the statute); *United States v. Janati*, 237 F. App'x 843, 847 (4th Cir. 2007) (18 U.S.C. § 1347 "gives ample notice that criminal liability attaches to those who knowingly give a representation that could be shown to be objectively false about services performed for the purpose of obtaining money. These specific, particular elements more than satisfy the demands of due process."); *United States v. Akande*, 2018 WL 3318877, at *3 (E.D. Ky. July 3, 2018) ("Sections 1347 and 1349 pass Constitutional muster, and neither section violates due process . . . . It is unreasonable that the Government should lay out precise guidelines for each type of health care fraud and how it might be committed, as no statute could encompass every type of criminal activity that might occur . . . . A person of ordinary intelligence can understand that criminal charges may be brought if they 'knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice—to defraud any health care benefit program.'").[1]

Courts have rejected similar arguments seeking to challenge indictments for failure to allege medical criteria. In *United States v. Janati*, 237 F. App'x 843, 846 (4th Cir. 2007), the Fourth Circuit rejected the defendants' claim that 18 U.S.C. § 1347 was "fatally vague" as applied to them because the alleged fraud "was based on the

---

[1] Johnston cites no case where a court has agreed with his argument and dismissed a wire fraud, health care fraud, or conspiracy indictment on the ground that "medical necessity" is undefined and vague. The materials he relies on—law review articles and inapposite cases involving different statutes—are neither authoritative nor persuasive.

standards of the CPT manual, which are too 'vague and ambiguous' to 'provide adequate guidance and/or notice upon which a criminal conviction could validly exist.'" The court held that the defendants were convicted under the federal health care fraud statute and "[a]ny vagueness in the CPT manual itself cannot be the basis for a due process challenge to the fraud violations in this case." *Id.*; *see also United States v. McGill*, 2016 WL 8716240, at *11 (E.D. Pa. May 13, 2016) (rejecting argument that reliance on Medicare regulation needed to satisfy health care fraud allegation in indictment because defendant was not charged with violating a Medicare regulation). The health care fraud statute "is a simple fraud statute." *McLean*, 715 F.3d at 136.  It "is not defined through other regulations." *Franklin-El*, 554 F.3d at 911 ("The complexity of Medicaid regulations does nothing to alter the straightforward nature of the health care fraud statute or the straightforward allegations of fraud lodged against Defendant.").

In addition, the scienter requirement in the charged statutes mitigates any purported due process concerns. *See United States v. Hoffert*, 949 F.3d 782, 788 (3d Cir. 2020) ("Rather than permitting the conviction of innocent persons, § 1521 has a scienter requirement that defines the level of culpability for the offense and which has a settled legal meaning.").  The criminal statutes charged in Count 1 are specific intent crimes.  To prove the defendants guilty on Count 1, the government will need to prove beyond a reasonable doubt that they *knowingly and intentionally* agreed to commit health care fraud (which requires willfulness) and wire fraud (which requires an intent to defraud) to defraud insurers or Pharmacy Benefits Administrators.  "The Supreme Court has recognized that a scienter requirement may mitigate a law's

vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Franklin-El*, 554 F.3d at 911; *see also Screws v. United States*, 325 U.S. 91, 101 (1945) ("[T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid."); *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952) ("The statute punishes only those who knowingly violate the Regulation.  This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid.").  "Although a specific intent requirement does not necessarily validate a criminal statute against all vagueness challenges, it does eliminate the objection that the statute punishes the accused for an offense of which he was unaware." *Franklin-El*, 554 F.3d at 911; *see also McLean*, 715 F.3d at 137 ("[T]he statute's mens rea requirement mitigates any ambiguity arising from the lack of clear medical guidance McLean alleges.  McLean could only be convicted if the government proved beyond a reasonable doubt that he acted 'knowingly and willfully' to defraud insurers, which necessarily entails proof that he knew the stent procedures were unnecessary.  This requirement of proof eliminates the fair notice concerns he raises."); *Janati*, 237 F. App'x at 847 ("The Janatis' contention that the CPT manual supports a vagueness claim would merit more serious consideration if the government failed to prove scienter . . . . [T]he Janatis' vagueness challenge would be no more than a challenge to the sufficiency of the evidence of their mental states."); *Akande*, 2018 WL 3318877, at *5 ("The scienter requirement requires that a defendant have some degree of guilty knowledge or

culpability in order to be found criminally liable for some conduct.  Section 1347 has

that scienter requirement, which will guide the jury as they decide whether Dr.

Akande knowingly and willfully committed health care fraud.") (internal quotation

marks and citation omitted).

> **B.    The Indictment's Allegations Regarding Test Adjudications and Preprinted Prescription Pads Do Not Render Count 1 Defective.**

Without specifically invoking the vagueness doctrine, Defendant Johnston

claims that "[m]uch of the remainder of the Indictment rests upon theories that are

similarly problematic, and thus can also not be the basis of a criminal prosecution."

Dkt. 126-1 at 27-29.  Defendant Johnston specifically targets the indictment's

allegations about "test adjudications" and the conspirators' use of preprinted

prescription pads.  *Id.*  This claim also fails.

The Indictment alleges that in the course of carrying out the health care fraud

and wire fraud conspiracy charged in Count 1, the defendants caused Central Rexall

employees and contractors to submit "test adjudications" to the Pharmacy Benefits

Administrator.  Indictment ¶¶ 25-26.  The Indictment defines "test adjudications" as

"false and fraudulent" claims that "used the identifying information, including patient

names, dates of birth, and insurance information, from prescriptions Central Rexall

had previously received for other compounded medications . . . without the knowledge

or consent of those individuals."  *Id.*  The Indictment further alleges that a test

adjudication falsely represented to the Pharmacy Benefits Administrator that Central

Rexall had received a valid prescription from a doctor with the combination of

ingredients specified in the claim when that prescription in fact did not exist.  *Id.*  The

Indictment further alleges that upon receiving a response "that the combination of ingredients in the test adjudication was covered and the amount of the insurance adjudication," Central Rexall employees would provide the information to defendant Casseri or defendant Brockmeier, reverse the claim, and shred the paper record of the test adjudication. *Id.* ¶ 27. The Indictment also alleges that the defendants "used the information from these test adjudications to design compounded medications based on the amount of money that insurance would pay for the compounded medications rather than on the medications' ability to help patients," and that, at the direction of the defendants, Central Rexall used preprinted prescription pads with formulas for compounded medications, including formulas that were determined based on the test adjudications. *Id.* ¶¶ 21, 29.

Defendant Johnston argues, citing one magazine article, that test claims are common, "useful," and consistent with industry practice, and that a person would not be on notice that submitting test adjudications could constitute health care fraud. Dkt. 126-1 at 27-28. Johnston can offer such evidence at trial (if it satisfies the Rules of Evidence), but this factual argument does not provide a basis to dismiss a properly pleaded charge in an indictment.

Moreover, Defendant Johnston is describing the very different practice of a pharmacy submitting to the PBA a claim for an *actual* prescription before filling it. The Indictment, by contrast, alleges that the defendants caused Central Rexall employees to submit phantom claims that falsely represented to the PBA that Central Rexall had received a prescription for the submitted medication from a licensed prescriber, when in fact there was no such prescription. Indictment ¶ 25. A

14

reasonable person knows that submitting a claim that is not based on any actual prescription received from a doctor is fraudulent. *See United States v. Thomley*, 2018 WL 6492955, at *2-3 (S.D. Miss. Dec. 10, 2018) (denying motion to dismiss an indictment based on argument that submitting fake "test" claims to health insurers "to determine how much health care benefit programs would reimburse for the formulas" of compounded medications was not illegal because "these were allegedly the manner and means Defendants used to accomplish the conspiracy's illicit goals"). Moreover, the Indictment alleges that submission of these false claims violated Central Rexall's agreement with the PBA, which required Central Rexall to submit claims only for actual valid prescriptions signed or properly authorized by a doctor or other qualified medical professional. *Id.* ¶ 9. The fact that Central Rexall's agreement with the PBA prohibited the submission of a fraudulent prescription drug claim certainly provides a further basis for the defendants to know that such conduct was fraudulent.

Johnston further argues that a person would not be on notice that it is a crime to use a preprinted prescription pad. The Indictment does not allege that the distribution of preprinted prescription pads, standing alone, is itself illegal. It simply, and properly, alleges that the use of preprinted prescription pads was part of the manner and means by which the defendants conspired to defraud insurers.

Count 1 properly alleges a detailed, well-defined conspiracy to commit health care and wire fraud. Defendants' request to dismiss that count should be denied.

**III.    COUNT 2 STATES A CLAIM AND IS NOT UNCONSTITUTIONALLY VAGUE.**

Count 2 of the Indictment charges all three defendants with conspiring to violate 18 U.S.C. § 1028(a)(7), which makes it a crime to "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." The Indictment alleges that the defendants conspired to use, and caused others to use, names, dates of birth, and insurance identification information of individuals who had previously received Central Rexall prescription medications to submit false test adjudications for compounded medications. The Indictment alleges that the defendants did this for the purpose of identifying compound medication formulas that insurance companies would cover and reimburse large amounts of money to Central Rexall, and that fraudulent prescriptions for compound medications with these formulas were subsequently filled by Central Rexall.

Defendant Johnston, joined by Defendants Brockmeier and Casseri, moves to dismiss Count 2 for failure to charge an offense following the Supreme Court's interpretation of a different statute, 18 U.S.C. § 1028A, in *Dubin v. United States*, 599 U.S. 110 (2023). Dkt. 126-1 at 31-38; Dkt. 125; Dkt. 127. Defendant Brockmeier also moves to dismiss Count 2, arguing that (1) it fails to state a claim; and (2) the statute that the Indictment charges the defendants conspired to violate is unconstitutionally vague. Dkt. 118. Defendant Casseri joins Defendant Brockmeier's motion to dismiss

16

Count 2.  Dkt. 125.  Count 2 properly charges an offense, and the Supreme Court's interpretation of a different statute in *Dubin* does not preclude this prosecution.[2]

### A.    *Dubin* Was Unique to the Aggravated Identity Theft Statute (18 U.S.C. § 1028A) and Does Not Apply to the Different Statute Charged in Count 2 of the Indictment (18 U.S.C. § 1028(a)(7)).

The defendant in *Dubin* was prosecuted for submitting a Medicaid claim for services that were provided to the patient, but which misstated the qualifications of the provider.  The Supreme Court interpreted two terms in the federal aggravated identity theft statute, 18 U.S.C. § 1028A(a)(1): "using" a means of identification "in relation to" health care fraud.  599 U.S. at 116-17.  The Supreme Court held that "[a] defendant 'uses' another person's means of identification 'in relation to' a predicate offense when th[e] use is at the crux of what makes the conduct criminal . . . . [W]ith fraud or deceit crimes . . . the means of identification specifically must be used in a manner that is fraudulent or deceptive."  *Dubin*, 599 U.S. at 131-32.  The Court should decline to extend *Dubin*'s holding to a statute that was not at issue in *Dubin*.  The *Dubin* Court's holding was based on the unique features of Section 1028A(a)(1), including the title ("Aggravated Identity Theft") and the two-year mandatory minimum penalty provision.

Key differences between the two statutes, which will be discussed in detail below, are set forth in the following table:

---

[2] The law applicable to a motion to dismiss an Indictment is set forth, *supra*, at 1-3.

|  | 18 U.S.C. § 1028A(a)(1) (*Dubin*) | 18 U.S.C. § 1028(a)(7) (Johnston, *et al.* Indictment) |
|---|---|---|
| **Statute Text** | "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" | "Whoever [affecting interstate commerce] . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." |
| **Statute Title** | "Aggravated identity theft" | "Fraud and related activity in connection with identification documents, authentication features, and information" |
| **Penalty** | Imprisonment of 2 years in addition to the punishment for the underlying felony | Imprisonment of not more than 5 years |
| **Predicate offenses** | Certain enumerated federal offenses set forth in 18 U.S.C. § 1028A(c) | Any unlawful activity that (a) violates federal law; or (b) is a felony under state or local law |

*Dubin* turned on the interpretation of two terms: "use" and "in relation to." 599 U.S. at 116-17. The statute referenced in Count 2 of the Indictment—18 U.S.C. § 1028(a)(1)—contains only one of these terms; it contains the term "use" but rather than the term "in relation to," it contains the different, more expansive term, "with the intent to commit, or to aid or abet, or in connection with." In *Dubin*, the Supreme Court held that the terms "uses" and "in relation to" were "particularly sensitive to context, and they d[id] not, standing alone, conclusively resolve this case." *Id.* at 118.

18

The Court, therefore, turned to tools of statutory interpretation, including (1) the statute's title, *id.* at 120-24; (2) the implications of adopting the "staggering breadth of the Government's reading" given the statute's mandatory two-year penalty provision, *id.* at 127-131; and (3) the text surrounding the indeterminate terms, *id.* at 124-127. In contrast to the aggravated identity theft statute, Section 1028A(a)(1), the title, context, and text of the key terms in 18 U.S.C. § 1028(a)(7) do not support a narrow interpretation limiting its application to only conduct constituting an ordinary understanding of "identity theft."

      1. *Title*

In interpreting Section 1028A, the *Dubin* Court was influenced by the statute's title: "Aggravated identity theft." *Id.* at 120-21 ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute."). This "title suggest[ed] identity theft is at the core of § 1028A(a)(1)." *Id.* at 124. The Court found that the title "Aggravated identity theft" supported a targeted definition of "uses" and "in relation to" that was limited to using the means of identity at the crux of the underlying criminality because the common understanding of "identity theft," as used in the statute's title, referred to fraudulently using another person's identifying data or documents. *Id.* at 121-23. A broader reading of "uses" and "in relation to" that could encompass the ancillary use of a means of identity in a crime was not consistent with the title "Aggravated identity theft." *Id.* The *Dubin* Court further noted that by using the term "Aggravated" in the statute's title to modify "identity theft," Congress "had in mind a particularly serious form of identity theft."

*Id.* at 124. It would be inconsistent with this title to subject "garden-variety overbilling" to Section 1028A. *Id.* at 122, 130-31.

Section 1028 is not titled "Aggravated identity theft" or even "Identity theft." Its title, "Fraud and related activity in connection with identification documents, authentication features, and information," is significantly broader and more capacious than Section 1028A's title and does not "suggest [that] identity theft is at the core of" Section 1028. *Id.* at 124. In fact, the Supreme Court in *Dubin* specifically contrasted Section 1028's "broad title" with Section 1028A's "far more targeted" title. *Id.* at 121. The differing titles, according to the Court, means that Section 1028A "is focused on identity theft specifically," while Section 1028 covers "all fraud involving means of identification." *Id.* (citing *Flores-Figueroa v. United States*, 556 U.S. 646 (2009)). The Indictment here alleges conduct aptly described by the title of Section 1028. When the defendants engaged in test adjudications to facilitate and continue their health care fraud and wire fraud conspiracy, they undoubtedly engaged in "fraud and related activity in connection with identification documents, authentication features, and information."[3]

### 2. Context & Policy

Another key reason for the *Dubin* holding was the Supreme Court's discomfort with subjecting defendants to automatic mandatory two-year prison sentences "for generic overbilling that happens to use ubiquitous payment methods" regardless of

---

[3] It is not dispositive that the heading under Count 2 of the Indictment is "Conspiracy to Commit Identity Theft". What matters is that the Indictment sets forth the charged statute and its elements.

whether the means of identity "had anything to do with the fraudulent aspect of the offense." *Dubin*, 599 U.S. at 128-129.  The Court was concerned that reading Section 1028A(a)(1) to apply "virtually automatically to a swath of predicate offenses" would allow a prosecutor to "hold the threat of charging an additional 2-year mandatory prison sentence over the head of any defendant who is considering going to trial." *Id.* at 131.  The Court believed that Section 1028A should be limited to situations "that warrant[] a 2-year mandatory minimum." *Id.* at 129.

These concerns are not implicated by Section 1028(a)(7).  Charges brought under Section 1028(a)(7) carry no mandatory prison sentence.  Accordingly, they do not "prevent[] sentencing judges from considering the severity of the offense" or force judges to sentence a defendant to a multi-year prison term where the loss amount is "small or there are other mitigating factors." *Dubin*, 599 U.S. at 127.

Similarly, Defendant Johnston's purported federalism concerns are misplaced. *See* Dkt. 126-1 at 35-36.  Each crime set forth in Section 1028 requires that the "transfer, possession, or use" be "in or affect[ing] interstate or foreign commerce" or otherwise be of federal concern.[4]  Section 1028 therefore is appropriately cabined to crimes of federal concern, as are a multitude of other federal criminal statutes that apply upon proof of interstate commerce.  *See, e.g.*, 18 U.S.C. § 1343 (wire fraud statute criminalizing a scheme or artifice to defraud where wires are sent "in

---

[4] Section 1028 also may apply if the defendant has the intent to use a document-making implement "to defraud the United States" or if the identification document appears to be issued by or under the authority of the United States, or if the means of identification is transported in the United States mail.  18 U.S.C. §§ 1028(a)(4) and (c).  Plainly, each of those offenses implicate important federal interests.

interstate or foreign commerce"); 18 U.S.C. § 1957(a) (money laundering statute criminalizing monetary transactions in criminally derived property "in or affecting interstate or foreign commerce"); 18 U.S.C. § 1951(a) (Hobbs Act robbery statute criminalizing robbery that "obstructs, delays, or affects commerce"). While these statutes may have broad applications, they are broad because Congress has decided that they should address harmful conduct that exists on a national scale, like the charges in the Indictment, which undermine the integrity of the nation's highly integrated health care system.

### 3. *Surrounding Text*

In *Dubin*, the Supreme Court applied the canons of statutory interpretation that a word is known by the company it keeps and Congress intended each word in a statute to have a non-superfluous meaning, to support its holding that "uses" in Section 1028A means the use of a stolen identity in a deceitful manner. 599 U.S. at 124-27. While Section 1028A and 1028(a)(7) both contain the phrase "transfers, possesses, or uses," the statutes differ in their text: Section 1028A prohibits using a means of identification of another person "during and in relation to" a felony, while Section 1028(a)(7) prohibits using a means of identification of another person "with the intent to commit, or to aid or abet, or in connection with, any unlawful activity." The *Dubin* Court did not analyze the text of this latter phrase or even, in any detail, Section 1028A's "during and in relation to" language.

Moreover, the same interpretive canons employed by the Supreme Court in *Dubin* require an interpretation of Section 1028(a)(7) that is broader than Section 1028A. Defendants' reading of Section 1028(a)(7) as indistinguishable from Section

1028A would render the two statutes redundant, and one of them superfluous.  *See*

*Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is

given to all its provisions, so that no part will be inoperative or superfluous, void or

insignificant.") (internal citation and quotation marks omitted); *Corley v. United*

*States*, 556 U.S. 303, 314 (2009) (same); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545,

554 (3d Cir. 2017) ("[W]e strive to avoid superfluity in construing statutes.").

The history and interaction between the two statutes makes clear that Section

1028A is not the same as Section 1028(a)(7) and was not intended to criminalize

identical conduct.  Congress enacted the broader Section 1028(a)(7) in 1998, making it

a criminal violation to use a means of identification of another person with the intent

to commit, or to aid or abet, or in connection with, any unlawful activity.  *See*

IDENTITY THEFT AND ASSUMPTION DETERRENCE ACT OF 1998, PL 105–318,

October 30, 1998, 112 Stat 3007.  Then, in 2004, Congress enacted the narrower

aggravated identity theft statute, Section 1028A, to add a more severe penalty for

certain "aggravated" identity theft crimes.  *See* IDENTITY THEFT PENALTY

ENHANCEMENT ACT, PL 108–275, July 15, 2004, 118 Stat 831.

If the statutes both require the same conduct, Congress would not have enacted

a different statute—Section 1028A—six years after enacting Section 1028(a)(7).  If

Congress merely intended to increase the penalty for the conduct already made

unlawful by Section 1028(a)(7), it would have amended Section 1028(a)(7), not left

Section 1028(a)(7) in place and legislated a new statutory provision.  *See United States*

*v. Garcia*, 2024 WL 170780, at *4 (W.D. Tex. Jan. 12, 2024) ("Given the Supreme

Court's clear pronouncement that § 1028A is intentionally more narrowly targeted

23

than § 1028, this Court declines to apply caselaw interpreting the meaning of 'impersonation' in § 1028A to its analysis of § 1028. The statutes criminalize different types of conduct.").

Finally, Johnston's invocation of the "rule of lenity," Dkt. 126-1 at 36, fails. The rule of lenity "applies only if after seizing everything from which aid can be derived, there remains grievous ambiguity." *Pugin v. Garland*, 599 U.S. 600, 610 (2023). *See also Shular v. United States*, 140 S. Ct. 779, 787 (2020) (applying the rule "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."). Because Section 1028(a)(7) is not ambiguous after considering its text and context, there is "no basis for resorting to the rule of lenity."

## B.    Even Under *Dubin*'s Standard, Count 2 States a Claim.

For the reasons set forth above, this Court should not extend *Dubin* and limit Section 1028(a)(7)'s applicability to where a "defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Dubin*, 599 U.S. at 114. But even if the Court applies the *Dubin* standard to Section 1028(a)(7), Count 2 of the Indictment states a claim under that standard.

*Dubin* limited Section 1028(a)(7) because the conduct alleged did not fit within the common understanding of identity theft. The conduct alleged in the Indictment here, by contrast, squarely constitutes identity theft. The Indictment alleges that the defendants "used the identifying information" of patients to submit test adjudication claims "without the knowledge or consent of the individuals whose identifying

24

information was used." Indictment ¶ 26. That is within the heartland of identity theft: using a person's personal identifying information without their consent.

According to *Dubin*, a "defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." 599 U.S. at 131. The *Dubin* Court expounded that "the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to 'who' is involved." *Id.* at 132.

The defendants' use of patients' names, dates of birth, and insurance information to submit false "test adjudications" was "in a manner that is fraudulent or deceptive" and was "at the crux" of what made their conduct criminal. As alleged in the Indictment, the submission of false test adjudications was a critical part of the underlying wire fraud and health care fraud conspiracy. The defendants used false test adjudications to design and manipulate combinations of ingredients both to obtain the highest possible insurance reimbursement, and to identify high-reimbursing substitute formulas when insurance companies stopped covering certain formulas. Indictment ¶¶ 24, 30. And the false test adjudications used identifying information of individuals without the knowledge or consent of those individuals. *Id.* ¶ 26. The defendants used the "means of identification" to submit false test adjudications to allow them to profit from the fraud scheme.

The misuse of Central Rexall's patients' identifying information was at the heart of the conspiracy to commit wire fraud and health care fraud. The co-conspirators falsely represented to the PBA that a doctor had authorized prescriptions

25

for compound medications for these individuals when in fact no such prescriptions existed for those medications.  This deception—centered on the identity of the individual—enabled Central Rexall to continue billing for medically unnecessary prescriptions.  The conspirators' use of stolen identities[5] to submit false test adjudications is distinct from the conduct at issue in *Dubin*.  In *Dubin*, the defendant misrepresented the qualifications of the employee who performed a psychological test, thereby inflating the amount of reimbursement.  *Dubin*, 599 U.S. at 114.  There was no deception at all related to the patient whose identifying information was the basis for the identity theft charge; the test billed to insurance was in fact performed, and was performed on that patient.  *Id.*  The identity of the patient whose information was used did not matter to the fraud and did not increase the profits from the fraud.  The deception in *Dubin* related to the individual performing the test and the date the test was performed.  *Id.*

After *Dubin*, the Eleventh Circuit upheld a conviction of a compounding pharmacy employee under the more stringent requirements of the aggravated identity theft statute.  *See United States v. Gladden*, 78 F.4th 1232 (11th Cir. 2023).  In *Gladden*, the defendant submitted claims to PBMs and insurance companies that were fraudulent in two ways: (1) she submitted claims using the names of former patients who were not the actual recipients of the medications; and (2) she represented that a doctor had authorized certain prescriptions when he had not.  *Id.* at 1245-46.  The

---

[5] It is appropriate to consider the conspirators' use of these identities as "stolen" even if they originally came into possession of the identifying information lawfully when they received actual prescriptions.  *See Dubin*, 599 U.S. at 122 n.6 ("Stealing can, of course, include situations where something was initially lawfully acquired.").

Eleventh Circuit held that both of these actions fell "squarely within the classic variety of identity theft left untouched by *Dubin*." *Id.* at 1246. Her use of former patients' "identifying information was itself fraudulent or deceptive because [the defendant] represented those patients were receiving the [medications], despite shipping the product to" the pharmacy's owner. *Id.* The use of the doctor's "means of identification was fraudulent because [the defendant] falsely represented he had authorized the additional prescriptions." *Id.*[6]

Count 2 of the Indictment charges similar false representations to the PBA: defendants' and their co-conspirators' use of patients' identifying information—without their knowledge or consent—in test adjudications was fraudulent and deceptive because they falsely represented that Central Rexall had received prescriptions for compound medications from a medical professional for certain patients when, in fact, no doctor had authorized those prescriptions and no patient had been prescribed those medications. Indictment ¶¶ 25-30. Just as in *Gladden*, the defendants and their co-conspirators here used the means of identity of doctors and patients to defraud the PBA and insurance companies in connection with their fraud scheme. "Identity theft encompasses when a defendant uses the information to deceive others," *Dubin*, 599 U.S. at 123, and the Indictment alleges that the defendants used a patient's and doctor's means of identity to deceive the PBA into

---

[6] Critically, *Dubin* and *Gladden* both were decided on post-trial challenges to the evidence, not as pre-indictment motions to dismiss. Defendants' contention that *Dubin*'s "crux" standard is not satisfied must fail at the motion-to-dismiss stage because "[t]he government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *DeLaurentis*, 230 F.3d at 661.

thinking there was an actual valid claim for a prescription, when there was not. "[U]nlike in *Dubin*, [the defendants here] did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill." *Gladden*, 78 F.4th at 1246. Through their role in submitting false test adjudications, the defendants' use of a means of identity is at the crux of what makes the conduct criminal. *See Dubin*, 599 U.S. at 118 ("[T]ake the pharmacist who swipes information from the pharmacy's files and uses it to open a bank account in a patient's name. That misuse of the means of identification would be integral to what made the conduct fraudulent because misrepresentation about who was involved was at the crux of the fraud.").

The defendants' primary rejoinder is that the Indictment fails the *Dubin* standard because it does not allege that Central Rexall received money directly as payment for the false test adjudications. Dkt. 126-1 at 37-38; Dkt. 118 at 6, 11. Rather, the false test adjudications were reversed before the PBA approved and paid money on those false claims. *Id.* But payment directly on the false test adjudications is not required for the test adjudications to be at the crux of the underlying fraud. The Indictment alleges that the false test adjudications played a critical and direct role in the health care fraud and wire fraud conspiracy to defraud the PBA and insurance companies. Far from playing an "ancillary" or unimportant role in the fraud, the defendants used information gleaned from the test adjudications to facilitate the submission of other medically unnecessary claims, for which Central Rexall was paid millions of dollars. *Id.*; *see also* Indictment ¶¶ 27-28. Further, the Indictment alleges that the entire fraud scheme would have ground to a halt when the PBA stopped

28

covering certain compound formulations, and the defendants and their co-conspirators were able to prolong the fraud by using test adjudications to identify alternate formulations and stay one step ahead of the PBA and insurance companies' efforts to stop the fraud.  *See* Indictment ¶ 30.  The defendants submitted false test adjudications for a purpose, not for sport, and the purpose was to make more money from fraud.  The Indictment alleges that the defendants used a stolen means of identifications in a deceitful manner and satisfies the *Dubin* standard.[7]

### C.    18 U.S.C. § 1028(a)(7) Is Not Unconstitutionally Vague.

As detailed above, "[a] criminal statute need only give fair warning that certain conduct is prohibited." *Hoffert*, 949 F.3d at 788 (citing *Ferriero*, 866 F.3d at 124).  "A defendant is deemed to have fair notice of an offense if the relevant statute defines the offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Blake*, 288 F. App'x at 793 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

Defendant Brockmeier does not say whether he is mounting a facial challenge to 18 U.S.C. § 1028(a)(7) or whether he asserts it is unconstitutionally vague as applied to him, but his challenge fails under either standard.  *See United States v. Mitchell*,

---

[7] Defendant Brockmeier offers several analogies for the apparent purpose of arguing that submitting false test adjudications to insurance is "no different than a shopper at a store asking a clerk, 'how much does this product cost' before the shopper heads to the check-out lane." Dkt. 118 at 11.  This is not an apt analogy.  In Defendant Brockmeier's analogy, the shopper is not lying to the clerk.  Moreover, while it might be analogous for a *patient* to ask how much a prescription costs before getting it filled, it is not analogous—or lawful—for a pharmacy to submit a false claim to determine how to maximize its profits from a fraudulent scheme, as alleged in the Indictment.

652 F.3d 387. 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid."); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial vagueness challenges are the "most difficult challenges to mount successfully").

To prove a violation of 18 U.S.C. § 1028(a)(7), the government must prove beyond a reasonable doubt that:

1. The defendant knowingly transferred, possessed, or used a means of identification of another person;
2. The defendant knew that the means of identification belonged to another person;
3. The defendant acted with the intent to commit, or aid or abet, or in connection with any activity that violates federal law or is a felony under any applicable State or local law;
4. The defendant acted without lawful authority; and
5. The transfer, possession, or use of the means of identification occurred in or affected interstate or foreign commerce.

Seventh Circuit Pattern Jury Instructions 1028(a)(7) (2023 ed.). Defendant Brockmeier does not show how any of the elements are unconstitutionally vague, though his focus on Justice Gorsuch's concurring opinion in *Dubin* suggests that he believes there is an infirmity with the "used" or "in connection with" elements.

Defendant Brockmeier bases his argument on Justice Gorsuch's concurring opinion in *Dubin*, but that opinion is not controlling or even persuasive. Justice Gorsuch would have held the aggravated identity theft statute—18 U.S.C. § 1028A— vague and ambiguous. *Dubin*, 599 U.S. at 133-39 (Gorsuch, J., concurring). However, none of the other justices agreed with Justice Gorsuch that the aggravated identity theft statute was unconstitutionally vague. Writing for the eight other justices, Justice Sotomayor's majority opinion pointedly disagreed with Justice Gorsuch's

analysis and held that the aggravated identity theft statute was not unconstitutionally vague. The Court reasoned:

> Adrift in a blizzard of its own hypotheticals, the concurrence believes that it is too difficult to discern when a means of identification is at the crux of the underlying criminality. The concurrence's bewilderment is not, fortunately, the standard for striking down an Act of Congress as unconstitutionally vague. There will be close cases, certainly, but that is commonplace in criminal law. Equally commonplace are requirements that something play a specific role in an offense, whether that role is articulated as a nexus, a locus, or proximate cause. Such requirements are not always simple to apply. Yet resolving hard cases is part of the judicial job description. Hastily resorting to vagueness doctrine, in contrast, would hobble legislatures' ability to draw nuanced lines to address a complex world. Such an approach would also leave victims of actual aggravated identity theft, a serious offense, without the added protection of § 1028A(a)(1).

*Dubin*, 599 U.S. at 132 n.10 (internal citations and quotation marks omitted). A federal appeals court was asked to strike down the aggravated identity theft statute as unconstitutionally vague after *Dubin* but declined to do so, citing *Dubin*'s guidance and the majority's response to Justice Gorsuch's concurrence. *See Gladden*, 78 F.4th at 1247. Defendant Brockmeier cites no case—and the United States is not aware of any—finding either the aggravated identity theft statute or 18 U.S.C. § 1028(a)(7) unconstitutionally vague. The Court should deny his motion to dismiss Count 2 on the ground that 18 U.S.C. § 1028(a)(7) is unconstitutionally vague.

## IV.    COUNT 1 AND COUNT 2 ARE NOT MULTIPLICITOUS.

In the alternative to his motions to dismiss Counts 1 and 2, Defendant Johnston alleges that Count 1 and Count 2 are multiplicitous and seeks the dismissal of one of the two counts on this basis. *Id.* at 38-45. Because Counts 1 and 2 are not multiplicitous, the Court should deny this motion.

### A. Applicable Law

"Multiplicity is the charging of a single offense in separate counts of an indictment." *United States v. Kennedy*, 682 F.3d 244, 254–55 (3d Cir. 2012) (citing *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir.1978)). "[T]he test for multiplicity examines whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts." *Id.* "The basic inquiry in determining whether counts of an indictment are truly separate, and not multiplicitous, is whether proof of one offense charged requires an additional fact that proof of the other offense does not necessitate." *Carter*, 576 F.2d at 1064. "Also of central importance is whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts." *Id.*

"To determine whether the offenses grow out of the same occurrence, [the Third Circuit] appl[ies] the test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932)." *United States v. Hodge*, 211 F.3d 74, 78 (3d Cir. 2000). "In *Blockburger* the Supreme Court states that, 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (quoting *Blockburger*, 284 U.S. at 304). "In other words, under the *Blockburger* test, a court looks to the statutory elements of the crime charged to determine if there is any overlap." *Id.* (internal quotation marks and citation omitted).

32

**B. Count 1 and Count 2 Are Not Multiplicitous.**

Applying *Blockburger*'s "same evidence" test, Counts 1 and 2 are not multiplicitous because there is not complete overlap of the statutory elements; each charged conspiracy requires proof of elements that the other does not.

To prove a violation of Count 1, the government must prove the following three elements beyond a reasonable doubt:

1. Two or more persons agreed to commit health care fraud or wire fraud, as charged in the Indictment;

2. The defendant was a party to or member of that agreement; and

3. The defendant joined the agreement or conspiracy knowing of its objective to commit health care fraud or wire fraud and intending to join together with at least one other alleged conspirator to achieve that objective; that is, the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to commit health care fraud or wire fraud.

To prove a violation of Count 2, the government must prove the following four elements beyond a reasonable doubt:

1. Two or more persons agreed to commit an offense against the United States, to transfer, possess, or use without lawful authority, a means of identification of another person with the intent to commit, aid or abet, or in connection with unlawful activity, as charged in the Indictment;

2. The defendant was a party to or member of that agreement; and

33

3.  The defendant joined the agreement or conspiracy knowing of its objective to defraud the United States, to transfer, possess, or use without lawful authority, a means of identification of another person with the intent to commit, aid or abet, or in connection with unlawful activity, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to transfer, possess, or use without lawful authority, a means of identification of another person with the intent to commit, aid or abet, or in connection with unlawful activity.

4.  At some time during the existence of the agreement, at least one of its members performed an overt act in order to further the objectives of the agreement.

Third Circuit Model Jury Instruction 6.18.371A.

Defendant Johnston concedes that Count 2 contains two elements that Count 1 does not: (1) proof of an overt act; and (2) proof of an agreement to transfer, possess, or use without lawful authority, a means of identification of another person with the intent to commit, aid or abet, or in connection with unlawful activity. *See* Dkt. 126-1 at 42 n.11. But Count 1 also contains an element that Count 2 does not, namely proof of an agreement to commit health care fraud or wire fraud. Count 2 alleges that the defendants conspired to transfer, possess, or use a means of identification with the intent to commit, aid or abet, or in connection with one of three federal offenses: wire fraud, health care fraud, or conspiracy to commit health care fraud or wire fraud. Count 2 does not require the government to prove a conspiracy to commit health care fraud or wire fraud. Conspiracy is just one of the three potential predicate acts; the

34

government can prove Count 2 by proving an underlying wire fraud or health care fraud. And unlike Count 1, Count 2 does not require the government to prove that the defendants *conspired* to commit health care fraud or wire fraud, only that they conspired to use a means of identification with the intent to commit, aid or abet, or in connection with a wire fraud, health care fraud, or conspiracy crime. Thus, Count 1 can be proven and Count 2 may be not proven (*i.e.*, if the government fails to prove an overt act in furtherance of the Count 2 conspiracy or if the government fails to prove an agreement to use, without lawful authority a means of identification), or Count 2 may be proven and Count 1 may not be proven (*i.e.*, if the government proves the defendants conspired to use a means of identity to aid and abet a health care fraud conspiracy—but did not conspire to commit health care fraud—or if the government proves the defendants conspired to use a means of identity to aid and abet the substantive offenses of health care fraud or wire fraud). *See, e.g.*, *United States v. Ayala*, 917 F.3d 752, 759 (3d Cir. 2019) ("convictions for both Hobbs Act robbery and Virgin Islands first degree robbery do not violate the Double Jeopardy Clause because each requires proof of an additional element not required by the other") (internal quotation marks and citations omitted); *United States v. Galindo*, 2012 WL 1945142, at *7 (D. Kan. May 30, 2012) (aggravated identity theft and predicate offenses not multiplicitous).

Even if the conduct underlying the conspiracies charged in Counts 1 and 2 were identical—and it is not—it is not multiplicitous or a violation of double jeopardy for a defendant to be charged with two separate statutory provisions if Congress intended that each statute be a separate offense. "Where the same conduct violates two

35

statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature—in this case Congress—intended that each violation be a separate offense." *Garrett v. United States*, 471 U.S. 773, 778 (1985) (holding that Congress intended to make a continuing criminal enterprise and predicate offense separate offenses and "intended to permit prosecution for both the predicate offenses and the CCE offense"); *United States v. Komolafe*, 246 F. App'x 806, 812 (3d Cir. 2007) ("If such legislative intent is clear from the face of the statute or the legislative history, then double jeopardy principles are not violated."). Here, the statutes charged in Count 1 and Count 2 are part of different statutory schemes enacted years apart. 18 U.S.C. § 1349 was enacted in 2002 as part of the Sarbanes-Oxley Act. SARBANES–OXLEY ACT OF 2002, PL 107–204, July 30, 2002, 116 Stat 745. The objects of the Count 1 conspiracy are 18 U.S.C. § 1343, which was enacted in 1952 (c. 879, § 18(a), 66 Stat. 722), and 18 U.S.C. § 1347, which was enacted in 1996 as part of the Health Insurance Portability and Accountability Act. (Pub.L. 104-191, Title II, § 242(a)(1), Aug. 21, 1996, 110 Stat. 2016). 18 U.S.C. § 371 was enacted in 1909 and the object of the Count 2 conspiracy, 18 U.S.C. § 1028(a)(7), was enacted in 1998 as part of the Identity Theft and Assumption Deterrence Act of 1998 (IDENTITY THEFT AND ASSUMPTION DETERRENCE ACT OF 1998, PL 105–318, October 30, 1998, 112 Stat 3007). "Where, as here, the two statutory provisions at issue are located under distinct statutory schemes enacted several years apart, it is appropriate to assume from silence that the legislature intended to allow punishments as long as *Blockburger* is satisfied." *United States v. Salahmand*, 2009 WL 10680619, at *7 (D.D.C. May 12, 2009).

36

**C. The "Liotard" Test is Inapplicable.**

Defendant Johnston urges the Court to disregard the *Blockburger* test and instead use a different "totality of the circumstances" test that the Third Circuit employed in *United States v. Liotard*, 817 F.2d 1074 (3d Cir. 1978).  *See* Dkt. 126-1 at 39-42.  The Court should decline Defendant Johnston's invitation because the *Liotard* test is applicable only when assessing a double jeopardy claim involving a prior conviction or acquittal (as opposed to two conspiracies charged in the same indictment) or when two counts of the *same* conspiracy statute are charged.  In *Liotard*, the defendant was indicted and then acquitted in the U.S. District Court for the Western District of Pennsylvania of conspiring to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 371.  817 F.2d at 1076.  He was then indicted on a charge of 18 U.S.C. § 371 for conspiring to steal from an interstate shipment of goods in the U.S. District Court for the District of New Jersey and moved to dismiss the DNJ indictment on double jeopardy grounds.  *Id.*  Both indictments involved allegations that Liotard conspired to steal trucks from the same trucking company lot during roughly the same time period.  *Id.*  The Third Circuit held that "the totality of the circumstances test" was appropriate to evaluate Liotard's double jeopardy claim."  *Id.* at 1078.  *United States v. Smith*, 82 F.3d 1261, 1264-65 (3d Cir. 1996), also cited by Johnston, similarly involved indictments in two separate jurisdictions, both charging the defendant with violating 18 U.S.C. § 371.  After he was acquitted of the charges in federal court in Kentucky, the defendant moved to dismiss the District of New Jersey charges on double jeopardy grounds, and the Third Circuit applied the *Liotard* test.  *Id.* at 1266-67.

37

In *United States v. Rigas*, 605 F.3d 194, 204-212 (3d Cir. 2010), the Third Circuit applied the *Liotard* test where the defendant was indicted under the same conspiracy provision—18 U.S.C. § 371—in two separate indictments in two separate courts, was convicted in one court, then moved to dismiss the indictment in the second court.  In determining that the *Liotard* test would be used, the Third Circuit affirmed that "the same-elements test is applicable . . . to distinct statutory provisions." *Id.* at 212; *see also United States v. Rigas*, 565 F. Supp. 2d 620, 633–34 (M.D. Pa. 2008), *aff'd in part, remanded in part*, 584 F.3d 594 (3d Cir. 2009), *on reh'g en banc*, 605 F.3d 194 (3d Cir. 2010), *and aff'd in part, vacated in part, remanded*, 605 F.3d 194 (3d Cir. 2010) ("In contrast to *Albernaz* and this case, the *Liotard* decision dealt solely with multiple conspiracies all charged under the offense clause of § 371, rather than charges under separate statutory provisions, and therefore, does not control here."). Assessing multiplicity or double jeopardy claims involving two distinct conspiracy statutes under the *Blockburger* rule also is mandated by Supreme Court precedent.  In *Albernaz v. United States*, 450 U.S. 333, 336, 339-40 (1981), the Supreme Court held that consecutive prison sentences for violations of two separate conspiracy statutes— 21 U.S.C §§ 846 and 963—did not violate double jeopardy even where the violations involved a "single agreement or conspiracy."  The Supreme Court rejected the contention that "*Blockburger* cannot be used for divining legislative intent when the statutes at issue are conspiracy statutes." *Id.* at 339.  The limitation on *Blockburger*, the Court held, applied only when one conspiracy statute was charged twice.  *Id.*; *see also Sanabria v. United States*, 437 U.S. 54, 70 (1978) ("Because only a single violation of a single statute is at issue here, we do not analyze this case under the so-called

'same evidence' test, which is frequently used to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes."); *Rigas*, 605 F.3d at 204 ("Thus, in *Albernaz* the Supreme Court concluded that the *Blockburger* test applies where the defendant's conduct violated multiple conspiracy statutes.").

The cases cited by Defendant Johnston applied the *Liotard* test only when the *same* conspiracy statute was charged. *See United States v. Travillion*, 759 F.3d 281 (3d Cir. 2014) (using *Liotard* test to assess two charged conspiracies both alleging violations of 21 U.S.C. § 846); *United States v. Irving*, 316 F. Supp. 3d 879, 894 (E.D. Pa. 2018) (using *Liotard* test to assess two charged conspiracies both alleging violations of 21 U.S.C. § 846); *United States v. Fumo*, 2008 WL 1731911, at *1-4 (E.D. Pa. Apr. 10, 2008) (using *Liotard* test to assess three charged conspiracies each alleging violations of 18 U.S.C. § 371). When an indictment charges *different* conspiracy statutes in the same indictment, the *Blockburger* test is used. *See United States v. Savage*, 2012 WL 1994736, at *8 (E.D. Pa. June 1, 2012) ("[T]he *Liotard* test does not apply to Savage's double jeopardy claim. The totality of the circumstances test applies where the successive conspiracy charges involve the same conspiracy statute. Here, the conspiracy charge in the 2005 Indictment and the conspiracy charge in the instant Indictment involve different conspiracy statutes."). Here, because the allegedly multiplicitous conspiracy counts charge two separate statutes— 18 U.S.C. § 1349 and 18 U.S.C. § 371—the *Blockburger* test should be used to assess Defendant Johnston's claim of multiplicity.

### D. A Multiplicity Claim is Not Amenable to a Ruling on a Motion to Dismiss

In any event, the proper time to bring a multiplicity challenge is at sentencing. "The primary danger of multiplicity is excessive punishment." *United States v. Golden*, 2023 WL 2446899, at *3 (3d Cir. Mar. 10, 2023) (citing *United States v. Pollen*, 978 F.2d 78, 83 (3d Cir. 1992)); *see also Jones v. Thomas*, 491 U.S. 376, 381 (1989) (defining the interest protected in the multiple punishment context as "ensuring that the total punishment [does] not exceed that authorized by the legislature"); *Hodge*, 211 F.3d at 78 ("If the two offenses grow out of the same occurrence then multiple *punishments* are impermissible.") (emphasis added). "Accordingly, the proper remedy is merging counts at sentencing." *Pollen*, 978 F.2d at 78 (citing *United States v. Centeno*, 793 F.3d 378, 392 (3d Cir. 2015)). In *Golden*, the Third Circuit held a multiplicity challenge to conviction and sentencing was moot because the sentencing court merged the two counts of conviction for purposes of sentencing, which "remedied any double jeopardy concerns." 2023 WL 2446899, at *3.

There is no reason to think that the existence of both Count 1 and Count 2 in the Indictment will prejudice the jury. Juries are routinely instructed that (1) an indictment is simply a description of charges and is not evidence of anything; and (2) the number of offenses charged is not evidence of guilt and they must separately consider the evidence that relates to each offense and return a separate verdict for each offense. Third Circuit Criminal Model Jury Instructions 3.07, 3.12. If the Court does not rule that Count 1 and Count 2 are not multiplicitous, it should defer a ruling

until sentencing in the interest of judicial economy, because the jury's verdict or the Court's sentence may moot the issue.

## V.    COUNT 3 IS NOT DUPLICITOUS.

Defendant Casseri claims that Count 3 of the Indictment is duplicitous because it alleges that he made more than one false statement when interviewed by federal agents.  His motion lacks merit and should be denied.

Duplicity is the improper joining of distinct and separate offenses in a single count.  *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998).  An indictment is not duplicitous where it does not charge different offenses in the same count, but instead charges different methods of completing the same offense in one count.  *United States v. Sourlis*, 953 F. Supp. 568, 572 (D.N.J. 1996) (rejecting a claim that a conspiracy charge was duplicitous because it alleged a scheme to commit bank fraud against three separate financial institutions).  The Federal Rules of Criminal Procedure specifically authorize charging two different methods of committing a crime in a single count.  *See* Fed. R. Crim. P. 7(c)(1) ("It may be alleged in a single count that the means by which the defendant committed the offense are unknown or the defendant committed it by one *or more* specified means.") (emphasis added).

Defendant Casseri contends that Count 3 is duplicitous because it charges that he made six false statements during an interview with federal agents.  Indictment ¶ 53.  It is well established that if a defendant makes multiple false statements in a single interview or other event, a single charge under 18 U.S.C. § 1001 is appropriate and not duplicitous.  *See, e.g., United States v. Crisci*, 273 F.3d 235, 238-39 (2d Cir. 2001) (rejecting duplicity challenge to single count charging seven false statements);

*United States v. Evans Concrete, LLC*, 2023 WL 3019058, at *5 (S.D. Ga. Apr. 20, 2023) ("multiple false statements in one interview can properly be charged in a single count because an indictment is not duplicitous for charging multiple ways of violating a statute in one count"); *United States v. Craigue*, 565 F. Supp. 3d 267, 271-72 (D.N.H. 2021) (citing numerous cases); *United States v. Herman*, 2018 WL 4901168, at *2 (C.D. Ill. Oct. 9, 2018) (§ 1001 "indictment alleg[ing] multiple false statements made on the same day . . . . is not duplicitous"); *United States v. McCafferty*, 2011 WL 933771, at *9 (N.D. Ohio Mar. 16, 2011) ("courts have found it appropriate to charge multiple false statements in a single count where the statements were all made in the same event"); *see also United States v. Fernandez*, 389 F. App'x. 194, 198-99 (3d Cir. 2010) (charging multiple false statements in a single perjury count not duplicitous).[8]

Defendant Casseri's motion raises the concern that the jury could convict without agreeing on which false statement he made.  In § 1001 cases in which multiple false statements are charged, this concern can be addressed by instructing the jury that they must unanimously agree on the false statement.  *See, e.g., Crisci*, 273 F.3d at 239;; *Evans Concrete*, 2023 WL 3019058, at *5; *McCafferty*, 2011 WL 933771 at *10; *see also Fernandez*, 389 F. App'x. at 198 (approving similar instruction for perjury charge).  Indeed, it is the practice of this Court to instruct the jury that they must be

---

[8] *United States v. Dilworth*, 2011 WL 6179278 (D.N.J. Dec. 12, 2011), discussed in Defendant Casseri's motion, is not to the contrary.  The defendant there was charged in one count not with making two false statements in one interview, but with making a false statement in an interview *and* producing a false document.  The court found that those events were sufficiently distinct that they should be charged as two separate offenses.  *Id.* at *3.  Making several false statements in the same interview is different, and the overwhelming weight of authority holds that charging multiple false statements in one count is appropriate and not duplicitous.

42

unanimous on which false statement a defendant made in order to find him guilty. *See* Jury Instructions, *United States v. Kaival Patel*, Crim. No. 22-35, Dkt. 94, at 34 ("You only need to find that one of these four statements meet these elements so long as you agree on that statement unanimously."). Defendant Casseri's concerns are unwarranted, and his motion should be denied.

## VI.    THE MONEY LAUNDERING CONSPIRACY AND MONEY LAUNDERING COUNTS STATE AN OFFENSE.

Defendant Johnston argues that the counts of the Indictment charging him with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 4), and money laundering, in violation of 18 U.S.C. § 1957(a) (Counts 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23), fail to state a claim because (1) the transactions did not involve proceeds of specified unlawful activity (because the underlying fraud charges are void for vagueness); (2) the Indictment fails to allege that Defendant Johnston knew that the property involved in the transactions was derived from unlawful activity; and (3) the alleged laundering is not distinct from the underlying fraud. Dkt. 126-1 at 45-49.[9]

The Court should reject Defendant Johnston's challenges to the money laundering counts. First, because Count 1 is not void for vagueness, the Indictment sufficiently alleges that the money laundering transactions involved proceeds of

---

[9] Defendant Johnston's motion to dismiss is limited to the counts where he is named as a defendant and he does not move to dismiss the money laundering counts where Defendant Brockmeier is the sole defendant (Counts 7, 8, 11, 12, 15, 16, 18, 20, 22, and 24). It is unclear whether Defendant Brockmeier joins Defendant Johnston's motion to dismiss money laundering counts, as he states only that he "joins in all applicable motions filed by his codefendant." Dkt. 127. To the extent the Court deems a motion has been made to dismiss the Brockmeier money laundering counts, it should fail for the same reasons as the motion to dismiss the Johnston money laundering counts.

43

specified unlawful activity.  Second, Count 4 of the Indictment tracks the elements of the statute and expressly alleges that Defendants Johnston and Brockmeier, "**_knowing_** that the property involved in the financial transactions represented the proceeds of unlawful activity . . . did **_knowingly_** conspire and agree with each other and with others to engage in monetary transactions . . . ."  Indictment ¶ 56 (emphasis added).  The charging paragraph for the substantive money laundering counts similarly alleges the mens rea element of 18 U.S.C. § 1957(a): "On or about the dates specified below, the defendant specified per count below did **_knowingly_** engage in the monetary transactions specified below . . . ."  *Id.* ¶ 63.  The term "knowingly" in Paragraph 63 applies to all clauses of the charging paragraph and mirrors the language of the statute.  *See* 18 U.S.C. § 1957(a) ("Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 . . . .").

Third, the money laundering conspiracy and substantive counts properly allege transactions involving proceeds of a complete offense, or of a completed phase of an offense.  *See United States v. Fallon*, 61 F.4th 95, 120 (3d Cir. 2023).  Johnston's argument demonstrates a misunderstanding of the money laundering doctrine of merger—which generally requires that money laundering transactions be distinct from the underlying fraud that generated the proceeds—and relies on out-of-context excerpts from *Fallon*.

The underlying fraud—or a phase of it—was completed each time the Pharmacy Benefits Administrator made payments to Central Rexall's bank account.  Indictment

44

¶ 57.  The Indictment alleges that the payments from the PBA to Central Rexall were the result of the submission of false and fraudulent claims for medically unnecessary compounded prescription medications.  *Id.* ¶ 14.  Once the PBA paid Central Rexall, the fraud was complete.  Each of the substantive money laundering counts, and each of the transactions listed in the money laundering conspiracy count, involves downstream transactions occurring after Central Rexall received payments from the PBA.  Specifically, the transactions involved the following bank accounts:

- Central Rexall to Bluen Medical, LLC (Count 4);

- Central Rexall to Pharmacy Management Group, LLC (PMG) (Count 4);

- Central Rexall to Defendant Johnston's personal account (Count 4);

- Central Rexall to Defendant Brockmeier's personal account (Count 4);

- Bluen to Defendant Johnston's personal bank account (Counts 4, 5, 9, 13, 14, 17, 19, 21, 23);

- Bluen to Defendant Brockmeier's personal bank account Counts 4, 7, 11, 15, 16, 18, 20, 22, 24);

- PMG to Defendant Johnstons personal bank account (Counts 4, 6, 10);

- PMG to Defendant Brockmeier's personal bank account (Counts 4, 8, 12).

Each transaction is one or two levels downstream from the payments from the PBA to Central Rexall consisting of fraudulent proceeds.  And the Indictment alleges that each transaction consisted of proceeds of the health care fraud and wire fraud conspiracy.

    Under binding Third Circuit precedent and caselaw from other circuits, these transactions are properly alleged as money laundering transactions separate from the

underlying fraud.  In *United States v. Omoruyi*, 260 F.3d 291, 296 (3d Cir. 2001), the Third Circuit held that "the money acquired through the mail fraud became 'proceeds' at the time the checks were honored by the various banks."  Because "the indictment charged six counts of mail fraud based on the mailing of fraudulently obtained checks to the various banks" and "money laundering counts based upon eight subsequent teller window cash withdrawals," "the mail fraud offenses were complete as of the time the six checks were placed in the mail for delivery to the banks, and thus the money thereafter derived from the checks constituted the proceeds of the already completed offenses."  *Id.*  In *United States v. Conley*, 37 F.3d 970, 980 (3d Cir. 1994), the Third Circuit held that money collected from poker machines at illegal gambling establishments was "'proceeds of specified unlawful activity' within the meaning of the money laundering statute" and "any subsequent financial transaction involving these proceeds . . . could form the basis of a charge of money laundering."

*United States v. Kennedy*, 707 F.3d 558, 561-62 (5th Cir. 2013), involved a mortgage fraud scheme.  Lenders wired closing funds to a title company and then the defendants funneled a portion of the proceeds to shell companies they controlled.  The Fifth Circuit rejected an argument that money laundering convictions should be reversed because the underlying wire fraud crime was purportedly incomplete at the time the money was transferred to the shell companies.  *Id.* at 566.  The Court agreed that "the wire fraud crime was complete when the lenders transferred the loan funds" to the title company, and the indictment "charge[d] defendants with money laundering for subsequent transactions."  *Id.*  "If the entire scheme had come to a halt upon the Kennedys' receipt of the funds, the defendants would still have been guilty of the

46

crime of wire fraud—which illustrates that the subsequent disbursements to the shell corporations have no bearing on the completion of the crime of wire fraud." *Id.* So too here. The money acquired by Central Rexall from the PBA became proceeds of a completed phase of health care fraud or wire fraud conspiracy at the time the money was paid into Central Rexall's bank account. If there were no further distributions of money from the Central Rexall bank account, the defendants still can be convicted of wire fraud and health care fraud conspiracy. *See United States v. Chartock*, 283 F. App'x 948, 956–57 (3d Cir. 2008) (financial transactions occurring after deposit of bribe into bank account were transactions involving "proceeds" of a completed phase of honest services fraud).

Defendant Johnston's reliance on *United States v. Fallon* is unavailing. *Fallon* reaffirmed the *Conley/Omoruyi* rule that money from unlawful activity becomes "proceeds" when it is "derived from an already completed offense, or a completed phase of an ongoing offense." 61 F.4th at 120 & n.97. The court in *Fallon* reversed the money laundering convictions because, under the unique facts of that case, the transactions charged as money laundering transactions did not involve proceeds of a completed phase of a crime. *Fallon* involved a company whose business was to provide the service to clients of returning unused pharmaceutical drugs to manufacturers, receive the refund from the manufacturers, and pass on the refund to its clients, retaining a fee for itself. 61 F.4th at 103-04. The defendants devised and executed a scheme to defraud certain clients by retaining refunds it received from the manufacturers rather than paying them to its clients. *Id.* at 104-05. The government charged the defendants with "conspiring to commit concealment money laundering

47

under 18 U.S.C. § 1956(a)(1)(B)(i) by laundering the proceeds of the . . . fraud schemes

through complex financial transactions . . . ." *Id.* at 115.  The Third Circuit held that

the funds paid by the manufacturers to the company "did not become 'proceeds' until

after . . . refund checks were issued to clients, minus the money from the diverted

[schemes].  At that point, the fraud offenses were complete."  *Id.* at 120.  It further

held that there was no evidence of concealment in "the only relevant financial

transactions for Appellants' money-laundering charge": "the transactions that

occurred *after* Appellants paid partial refunds to clients from the lump-sum

payments."  *Id.*

The key difference between *Fallon* and this case is that the fraud in *Fallon* was

not complete upon the company's receipt of payments from a third party.  The

company did not make fraudulent representations to induce manufacturers to pay it

money that they otherwise would not have paid; receiving payments from the

manufacturers was a legitimate part of the company's business.  The fraud in *Fallon*

occurred when the company decided not to pay a portion of the money it received from

the manufacturers to its clients, who were entitled to the payments.  The company

committed fraud by improperly *retaining* funds and diverting funds from the rightful

owners, their clients.  The Indictment, by contrast, alleges that fraud was complete

upon payment from the PBA to Central Rexall because those payments were based on

the submission of fraudulent claims for medically unnecessary prescriptions.  No

further steps—such as Central Rexall's improper retention of money that it should

have paid to its clients—were necessary to complete the fraud.  Unlike in *Fallon*, the

fraud did not require any steps or financial transactions after Central Rexall's receipt

48

of funds from the PBA.  So, financial transactions from Central Rexall's bank account

to Bluen, PMG, Defendant Johnston, or Defendant Brockmeier—and from PMG and

Bluen to Defendants Johnston and Brockmeier—are separate transactions involving

criminal proceeds, not part of the underlying fraud.[10]

In addition, the money laundering charge in *Fallon* was a conspiracy to commit

concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), not a conspiracy to

commit money laundering by transacting in criminal proceeds under 18 U.S.C.

§ 1957(a), as is charged in the Indictment here.  The *Fallon* court's decision hinged not

only on which transactions involved proceeds of a criminal offense, but also on

whether the government had proven that those transactions that involved proceeds

were "designed in whole or in part to conceal or disguise the nature, the location, the

source, the ownership, or the control of the ill-gotten proceeds from the fraud

schemes."  *Id.* at 122 (internal quotation marks and alterations omitted).  The Third

Circuit found that some of the financial transactions occurred after the funds became

proceeds of criminal activity and thus were "relevant financial transactions for

Appellants' money-laundering charge," but that there was "no evidence of Appellants'

intent to conceal illicit proceeds separate from their intent to commit the underlying

fraud scheme."  *Id.* at 120.  The Third Circuit's analysis implies that its decision would

have been different had the defendants been charged with conspiracy to commit

---

[10] The Indictment does not allege—and Defendant Johnston offers no argument—that
the transactions charged as money laundering transactions did not involve proceeds
because they were "integral to or an expense associated with" the underlying fraud.
*See United States v. Richardson*, 658 F.3d. 333, 340 (3d Cir. 2011).

money laundering by transacting in criminal proceeds, which does not require evidence of an intent to conceal.

Defendant Johnston cherry-picks language from *Fallon* to advance a rule that a defendant cannot be charged with money laundering unless he conducts a transaction containing funds from a bank account over which he had exclusive, sole control. Dkt. 126-1 at 47-48. But in *Omoruyi*, the Third Circuit rejected a similar argument that "money cannot be 'proceeds'" and the defendant could not "be deemed to have possession over them . . . because the funds were never credited to an account under the name Austin Omoruyi." 260 F.3d at 296. The Third Circuit held that the fact that funds were in accounts "under false names" was "not of legal consequence" because "[a]lthough deposited under false names, the money was credited to accounts over which Omoruyi had control, and therefore the money was in his possession." *Id.* at 297. And regardless of the language used in *Fallon*, the relevant transactions there were not limited to transactions from bank accounts in the defendants' names individually. 61 F.4th at 105, 120-122. The Indictment alleges that Defendants Johnston and Brockmeier controlled the companies (Central Rexall, Bluen, and PMG) in whose names the alleged money laundering transactions originated. Indictment ¶¶ 1, 59, 61, 63.[11]

---

[11] The other cases cited by Defendant Johnston do not support his argument. *United States v. Piervinanzi*, 23 F.3d 670, 674, 676-83 (2d Cir. 1994), was, like *Fallon*, a theft case. The defendant siphoned money from a legitimate bank account into his account. *Id.* The money did not become fraud proceeds before it was received in his account illegitimately; it became proceeds of a fraud crime because he stole it. *Id.* Because the transfer from the legitimate account to the defendant's account was what made it fraud, that same transaction could not also be the basis for money laundering. *Id.* *United States v. Lovett*, 964 F.2d 1029, 1042 (10th Cir. 1992), and *United States v.*

Finally, Count 1's mention of the defendants' receipt of fraudulent proceeds does not mean that the money laundering charges fail to state a claim. *See* Dkt. 126-1 at 48-49. It is routine and unremarkable that there is a connection between the underlying wire fraud and health care fraud conspiracy and the conspiracy to transact in the proceeds of that fraud conspiracy. Indeed, one element of the money laundering offenses is that the defendants transacted in the proceeds of the crime charged in Count 1. Similarly, the ultimate receipt of money that they could spend and use was the defendant's motive for engaging in the wire fraud and health care fraud conspiracy. There will often "be one overarching scheme" involving fraud and money laundering; "the question is whether within the 'single scheme' . . . there is more than one fully completed crime." *Kennedy*, 707 F.3d at 565-66; *see also Conley*, 37 F.3d at 980 ("The fact that there may be some overlap in the acts alleged to constitute the conduct of an illegal gambling business and money laundering does not give us pause."). The Indictment properly alleges that Defendants Johnston and Brockmeier engaged in monetary transactions involving proceeds of a completed phase of wire fraud and health care fraud conspiracy, and the motion to dismiss should be denied.[12]

---

*Butler*, 211 F.3d 826, 830 (4th Cir. 2000), simply describe the merger doctrine that is not violated by the Indictment here because the money laundering transactions are separate from the underlying fraud crime.

[12] Even were a potential merger problem identified, a challenge based on merger is the type of fact-based inquiry that cannot be resolved by a motion to dismiss. *United States v. LaCost*, 2010 WL 3522334, at *2-3 (C.D. Ill. Sept. 2, 2010); *United States v. Finch*, 2010 WL 3938176, at *7 (D. Haw. Sept. 30, 2010); *United States v. Renzi*, 2012 WL 1029571, at *3 (D. Ariz. Mar. 27, 2012).

**VII.    THE INDICTMENT ALLEGES CONDUCT IN NEW JERSEY AND SHOULD NOT BE DISMISSED FOR LACK OF VENUE.**

The Indictment alleges the three defendants conspired "in the District of New Jersey" with New Jersey distributor William Hickman and many others to market Central Rexall medications in New Jersey and defraud New Jersey state insurance plans and other insurance plans out of tens of millions of dollars.  Indictment ¶ 13. The Indictment further alleges that the defendants conspired to commit identify theft "in the District of New Jersey" by using patient information without their consent, a conspiracy that directed Hickman to find patients in New Jersey and then used the information of New Jersey patients to run test adjudications.  *Id.* ¶ 45. And the Indictment alleges that Defendants Johnston and Brockmeier conspired "in the District of New Jersey" to transfer the fraud proceeds received from the State of New Jersey through several accounts and then to their own personal bank accounts.  *Id.* ¶ 56. Despite these and many other clear allegations, Defendant Johnston, joined by Brockmeier, argues that he never set foot in New Jersey and cannot be prosecuted in New Jersey for conspiring to steal from the New Jersey taxpayers and transfer the money into his pockets.  And Defendant Casseri argues that even though the Indictment alleges that he made false statements in the District of New Jersey, he cannot be prosecuted here either.  These arguments fail to apply the governing law and ignore the plain allegations of the Indictment establishing venue.  Defendants' motions to dismiss for lack of venue should be denied.

An indictment need only "allege venue 'without a facially obvious defect.'" *United States v. Menendez*, 137 F. Supp. 3d 688, 694 (D.N.J. 2015), *aff'd*, 831 F.3d 155

(3d Cir. 2016) (Walls, J.) (quoting *United States v. Perez*, 280 F.3d 318, 327 (3d Cir. 2002)).  "Courts have held that, 'as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied.'" *Menendez*, 137 F. Supp. 3d at 694 (quoting *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006)).  By itself, an allegation that the defendant committed the offense "in the District of New Jersey" is "sufficient to withstand a motion to dismiss an indictment for lack of venue."  *Menendez*, 137 F. Supp.3d at 694-95; *accord United States v. Lallande*, 2023 WL 5035317, at *3 (D.N.J. Aug. 8, 2023).  If the Indictment includes an allegation that the defendant committed the offense in the forum district, the indictment need not also allege an overt act establishing venue.  *See United States v. Shoss*, 523 F. App'x 713, 715-16 (11th Cir. 2013).  The Third Circuit stressed in affirming Judge Walls's *Menendez* decision that a District Court must accept as true an allegation that the defendant committed the offense in New Jersey, and a motion to dismiss "is not a permissible vehicle for addressing the sufficiency of the government's evidence."  *Menendez*, 831 F.3d at 175-76 & n.3 (cleaned up).

## A.    Count 1

Johnston claims that Count 1 lacks any allegation of venue in New Jersey.  The charging paragraph alleges that the defendants conspired "in the District of New Jersey" to commit health care fraud and wire fraud, Indictment ¶ 13, and under *Menendez*, that allegation is sufficient by itself to defeat the motion to dismiss.  But there is much more.  Continuing offenses, such as conspiracy, that are "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued,

or completed." 18 U.S.C. § 3237(a).  Venue is proper for a conspiracy charge so long as one overt act was committed by any conspirator in New Jersey in furtherance of the conspiracy.  *See Whitfield v. United States*, 543 U.S. 209, 218 (2005) ("this Court has long held that venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense"); *United States v. Perez*, 280 F.3d 318, 329 (3d Cir. 2002) ("[V]enue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy"; an Indictment need not allege that each co-conspirator individually committed an overt act in the charged district).

Count 1 alleges numerous actions in New Jersey by defendants' co-conspirators. Count 1 alleges that defendants conspired with William Hickman, who is identified as a "New Jersey distributor for Central Rexall."  *Id.* ¶ 1.g.  Count 1 states that defendants learned that the New Jersey State Health Benefits Program ("SHBP") and School Employees' Health Benefits Program ("SEHBP"), plans administered by the Pharmacy Benefits Administrator, would reimburse thousands of dollars for compounded medications.  *Id.* ¶ 5, 7, 15.  Count 1 then describes how the defendants carried out their fraudulent scheme through the actions of agents and distributors, which includes their co-conspirator Hickman, operating in New Jersey:

- Hickman "caus[ed] the submission of false and fraudulent insurance claims to Pharmacy Benefits Administrator . . . ." *Id.* ¶ 14.
- Defendants "entered into agreements with distributors," *i.e.*, Hickman, to market Central Rexall compounded medications.  *Id.* ¶ 22.
- At the direction of defendants, distributors such as Hickman marketed medications directly to patients and beneficiaries of insurance plans administered by Pharmacy Benefits Administrator.  *Id.* ¶ 33.

54

- "Central Rexall distributors [again, that means Hickman] obtained prescriptions that were not medically necessary and fraudulent . . . ." *Id.* ¶ 34.

As a result of the fraudulent actions taken by Defendants' coconspirator Hickman in New Jersey, among others, fraudulent prescriptions were faxed "from medical offices in New Jersey" to Central Rexall, *id.* ¶ 10; Central Rexall submitted claims to Pharmacy Benefits Administrator, *id.* ¶ 11; and Central Rexall, which was controlled by Johnston and Brockmeier, "shipped a large percentage of its compounded medications to SHBP and SEHBP beneficiaries in New Jersey." *Id.* ¶ 31. Count 1 plainly alleges conduct by Defendants' coconspirators in New Jersey.

Defendant Johnston claims that venue is improper because he allegedly was never in New Jersey and his pharmacy was in Louisiana. But the law is clear that venue is proper if, as is alleged in Count 1, just one of a defendant's coconspirators commits an act in furtherance of the conspiracy in the forum state. He also relies heavily on *United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014), while ignoring its facts and procedural posture. That decision came after a trial, and the Third Circuit found venue improper because the trial evidence showed that "neither Auernheimer nor his co-conspirator Spitler performed . . . any overt act in furtherance of the conspiracy in New Jersey." *Id.* at 535. Here, by contrast, Count 1 alleges an entire course of conduct by the coconspirators to market medications in New Jersey, obtain medically unnecessary prescriptions in New Jersey, cause those prescriptions to be faxed from New Jersey to Louisiana, ship medications to New Jersey, and defraud New Jersey state insurance plans. The motion to dismiss Count 1 for lack of venue should be denied.

55

### B.    Count 2

Defendant Johnston's objection to Count 2 is similarly infirm.  Count 2 alleges a conspiracy to obtain the identifying information of individuals who received Central Rexall medications, including individuals in New Jersey, and use that information to run test adjudications, which was part of their conspiracy to commit health care and wire fraud.  Like Count 1, Count 2 alleges that the defendants conspired "in the District of New Jersey," Indictment ¶ 45, and that allegation is sufficient by itself under *Menendez* to allege venue.

But again there is more.  Count 2 realleges and incorporates all the allegations in Count 1 (save the charging paragraph), which includes all the New Jersey activities discussed in the previous section.  And then (because 18 U.S.C. § 371, unlike 18 U.S.C. § 1349, requires an overt act) paragraph 49 of Count 2 alleges that the defendants committed or caused numerous overt acts in New Jersey in furtherance of the conspiracy.  Paragraph 49 first alleges that Defendant Casseri sent text messages to co-conspirator William Hickman in New Jersey about test adjudications.  Indictment ¶ 49.a, b.  Because test adjudications were at the heart of the conspiracy charged in Count 2, those messages were acts in furtherance of the conspiracy.  Sending an electronic communication to the forum district establishes venue.  *See, e.g., United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (venue appropriate where electronic communication received); *Lallande*, 2023 WL 5035317, at *3 (venue appropriate if wire transfer travelled through New Jersey).

Count 2 then details efforts by Hickman *in New Jersey* to find and obtain the patient information at the heart of this conspiracy:

     d.     On or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions.

     e.     After October 15, 2015, William Hickman and people working with him continued to try to find patients in New Jersey to receive Central Rexall prescriptions.

     f.     On or about January 7, 2016, a Central Rexall prescription for Individual 3 was signed in New Jersey and faxed to Central Rexall.

Indictment ¶ 49. The patient information obtained from the conspiracy's efforts in New Jersey was then used to run test adjudications. *Id.* ¶ 49.g. Count 2 more than adequately alleges venue in New Jersey.

Defendant Johnston nonetheless argues that venue is improper because the Indictment supposedly fails to allege an "essential conduct element" occurred in New Jersey. But the Indictment alleges that the defendants conspired in New Jersey, Indictment ¶ 45, which is sufficient under *Menendez*. The Indictment alleges overt acts in furtherance of the conspiracy in New Jersey, which is also sufficient without more under *Whitfield* and *Perez*. And the Indictment includes allegations that the New Jersey coconspirators performed the essential conduct of obtaining patient information in New Jersey, including the patient information of Individual 3 and another New Jersey patient, which was used to run a test adjudication. *Id.* ¶ 39. This Court has venue over Count 2.

## C.    Count 3

Defendant Casseri moves to dismiss for lack of venue Count 3, which charges him with making false statements to FBI agents and other government agents. Once

again, Count 3 alleges that Casseri made those false statements "in the District of New Jersey," which is sufficient under *Menendez* to defeat his motion to dismiss.

In support of his motion, Defendant Casseri asks the Court to consider information that is not in the Indictment: a calendar entry showing that the interview during which Casseri made the lies alleged in Count 3 took place via videoconference, and Casseri's assertion about where Casseri was located during the interview. This is of course improper; a motion to dismiss must be based only on the Indictment and is not a time to test the sufficiency of the Government's evidence. *See, e.g., Menendez*, 831 F.3d at 175-76 & n.3. But to address Defendant Casseri's extra-record assertions, the Government will present evidence at trial that the FBI agents who interviewed Casseri via videoconference and heard his false statements were located in New Jersey during the interview. And so Casseri's false statements were made in New Jersey because he conveyed them via videoconference to agents in New Jersey and his statements were heard by agents in New Jersey. The Second Circuit has held that if a defendant sitting outside the forum district makes false statements in a telephone call to an agent located in the forum district, venue exists for a § 1001 charge in the forum district. *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990). This holding is consistent with the established principle that if a defendant or a defendant's co-conspirator communicates by telephone or other electronic means with a person located in the forum district, venue exists in the forum district. *See, e.g., United States v. Renteria*, 903 F.3d 326, 331-32 & n.35 (3d Cir. 2018) (venue appropriate because defendant's co-conspirators directed phone calls to an individual in the forum district); *United States v. Rommy*, 506 F.3d 108, 121-22 (2d Cir. 2008) (venue appropriate based

on calls made by agent in forum district to defendant outside forum); *United States v. Cordero*, 668 F.2d 32, 43-44 (1st Cir. 1981) (Breyer, J.) (venue appropriate because conspirators had a telephone call with agent in the forum district); *United States v. Santurtan-Teran*, 2021 WL 2371231 at *2 (M.D. Pa. June 9, 2021) (same). As the Second Circuit colorfully explained in *Rommy*, when a defendant speaks on the telephone to someone in the forum district, he "effectively propels . . . his voice . . . beyond his own physical location into that of the person with whom he is speaking." 506 F.3d at 122.[13]

Venue is proper in this district because the Indictment alleges that Casseri made his false statements in this district and the evidence will show that he made the false statements to agents who were present in New Jersey when they heard the false statements. His motion to dismiss should be denied.

### D.    Count 4

Defendant Johnston's objection to Count 4, which charges Johnston and Brockmeier with conspiracy to commit to engage in financial transactions in

---

[13] Defendant Casseri's brief discusses the split in the circuits about whether venue is proper for a § 1001 false statements charge, based on the downstream effects of the false statements, if the defendant made false statements in an interview conducted solely outside the forum district. Because the statements here, unlike the statements in those cases, were made to agents located in the forum district, it is not necessary to reach this question or the circuit split. The Government notes, however, that district courts in New Jersey and elsewhere in the Third Circuit have followed the majority view and held that venue over a § 1001 charge does exist in the forum district based on the statement's effects in the forum district, such as its effects on a pending investigation. *See, e.g., United States v. Brassington*, 2010 WL 3982036 at *12-13 (D.N.J. Oct. 8, 2010) (Cavanaugh, J.); *United States v. Aprahamian*, 2022 WL 221615, at *6-8 (E.D. Pa. Jan. 25, 2022); *United States v. Brennan*, 452 F.Supp.3d 225, 230, 233-37 (E.D. Pa. 2020).

criminally derived property of a value greater than $10,000, fares no better. Count 4 alleges the conspiracy occurred "in the District of New Jersey, and elsewhere," Indictment ¶ 56, which is sufficient by itself under *Menendez* to establish venue. But once again, the Indictment alleges more than that.

Paragraph 55 incorporates the allegations of Counts 1 and 2 of the Indictment, including that the underlying conspiracy operated in New Jersey through the activities of William Hickman and others. One of those allegations, Paragraph 49.d of Count 2, specifically alleges: "On or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions." Paragraph 49.d clearly alleges an overt act in New Jersey in furtherance of the conspiracy, that is, a financial transaction of more than $10,000 in criminally derived property (proceeds that Central Rexall received as a result of the fraudulent conspiracy), which is also sufficient to establish venue. *See Whitfield v. United States*, 543 U.S. at 218. And paragraph 59 alleges Johnston and Brockmeier "caused the transfer of the proceeds of the conspiracy from the State of New Jersey to Pharmacy Benefits Administrator and from Pharmacy Benefits Administrator to Central Rexall's bank account in Louisiana . . . ." All of these allegations are more than sufficient to establish venue over Count 4 in New Jersey. The motion of defendants Johnston and Brockmeier to dismiss Count 4 for lack of venue should be denied.

### E.    Counts 5-24

Counts 5 through 24 allege specific transactions in criminal proceeds conducted by Johnston and Brockmeier.  These counts incorporate by reference the allegations (other than the charging paragraph) of Counts 1, 2, and 4.  Indictment ¶ 62.  Those allegations include the allegations discussed above detailing how the conspiracies to commit health care fraud, wire fraud, and identity theft operated in New Jersey.  The incorporated allegations also include paragraph 59 from Count 4:

> It was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER caused the transfer of the proceeds of the conspiracy to commit health care fraud and wire fraud from the State of New Jersey to Pharmacy Benefits Administrator and from Pharmacy Benefits Administrator to Central Rexall's bank account in Louisiana, and then caused the transfer of the proceeds from Central Rexall's bank account to the bank accounts of Bluen Medical and PMG and from the bank accounts of Bluen Medical and PMG to the personal bank accounts of defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER.

The allegations of paragraph 59 establish venue based on the special venue provision for money laundering prosecutions.  Section 1956(i)(1) of Title 18 provides that a prosecution for a violation of section 1957 "may be brought in . . . (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted."  This special venue provision's requirements are satisfied here:  the "prosecution for the underlying specified unlawful activity could be brought," and in fact is being brought, in New Jersey.  Paragraph 59 further alleges that the defendants "caused the transfer of the proceeds," which satisfies the statute's

requirement to "participate[] in the transfer of the proceeds," "from the State of New Jersey," which tracks the statute's element of a transfer from the forum district. These allegations are sufficient to defeat a motion to dismiss for lack of venue.

## VIII. THE ALLEGATION THAT DEFENDANT JOHNSTON RECEIVED $34,000,000 FROM HIS CRIMINAL CONDUCT IS NOT SURPLUSAGE.

Defendant Johnston moves to strike as irrelevant surplusage the Indictment's allegation that "[i]t was further part of the conspiracy that defendant CHRISTOPHER KYLE JOHNSTON received over $34,000,000 from Central Rexall from 2014 through 2016." Indictment ¶ 38. He claims that this allegation was included solely to appeal to the jury's presumed biases against the lifestyles of the rich, but the Indictment includes no allegations about his homes, expenditures, or lifestyle. The allegation simply states the amount that Johnston received from the fraud scheme alleged in the Indictment. It is relevant and should not be stricken as surplusage.

To prevail on a motion to strike an allegation as surplusage, a defendant must show that the allegation is both irrelevant and prejudicial. *United States v. Hedgepeth*, 434 F.3d 609, 613 (3d Cir. 2006). Motions to strike allegations as surplusage are evaluated under an "exacting standard," *United States v. Alsugair*, 295 F. Supp.2d 306, 317 (D.N.J. 2003), and "are rarely granted." *United States v. Hedgepeth*, 434 F.3d at 611. "A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory or prejudicial matter." *Alsugair*, 295 F. Supp.2d at 317 (cleaned up).

62

The allegation that Johnston received $34,000,000 from the fraud is relevant to show the scope of the fraud and his motive for the crimes alleged in the Indictment. Numerous cases have held that allegations of the money a defendant received from a charged crime are relevant to show the defendant's motive and intent and should not be stricken as surplusage. In *United States v. Eisenberg*, 773 F. Supp. 662, 701 (D.N.J. 1991), the court denied a motion to strike an allegation of the proceeds defendants received from the charged scheme "because it may be relevant to motive and intent." In *United States v. Bortnick*, 2004 WL 2861868, at *4 (E.D. Pa. Nov. 30, 2004), the court denied a motion to strike allegations of the amount defendant paid himself and his family because the allegations showed the scope of the fraud and defendant's "intent and motive in taking the allegedly fraudulent actions." *See also, e.g., United States v. Koranki*, 2010 WL 2868183, at *1 (W.D. Okla. July 20, 2010) (denying motion to strike allegations of value of items defendant fraudulently obtained as they show the scope of the scheme and defendant's motive); *United States v. Hanna*, 198 F. Supp.2d 236, 245 (E.D.N.Y. 2002) (denying motion to strike allegations of profits made by defendants, as they were relevant to show motive).

The cases cited by Defendant Johnston are not persuasive authority to the contrary. *United States v. Schwening*, 2006 WL 1559668, at *5 (D. Neb. June 5, 2006), struck an allegation of the total value of contracts won by one involved entity, which was not an allegation of the defendant's proceeds from the crime. Similarly, in *United States v. Rush*, 807 F. Supp. 1263, 1265-66 (E.D. La. 1992), the court struck an allegation of what the state would lose—again, not the defendant's proceeds—but said

that the government was free to prove the harm to the state at trial.[14]  Finally, *United States v. Lavin*, 504 F. Supp. 1356, 1362 (N.D. Ill. 1981), struck allegations not of what the defendant received but of the total amount of property reassessments, largely because that amount overstated the scope and result of the fraud.  No case cited by Defendant Johnston holds that allegations of the amount received by the defendant from a crime is surplusage, and numerous cases hold that such allegations are relevant and not surplusage.  Defendant Johnston's motion should be denied.

IX.    **DEFENDANTS' REQUEST FOR A BILL OF PARTICULARS SHOULD BE DENIED BECAUSE THE DEFENDANTS HAVE RECEIVED A DETAILED INDICTMENT AND EXTENSIVE DISCOVERY.**

Defendants seek an extensive bill of particulars detailing, among other things, the name of each coconspirator, the place where each event occurred, and each and every act they did.  Defendants claim that they cannot prepare for trial unless the Government provides detailed answers to what amounts to contention interrogatories.  In light of the details provided in the Indictment and the extensive information provided in discovery, their request for a bill of particulars should be denied.

A.    **A Bill of Particulars is Unwarranted Because the Indictment and Discovery Give the Defendants Ample Information.**

A bill of particulars is required only when an indictment is too vague to permit the defendant to understand the charges and prepare a defense, avoid unfair surprise, and assert a claim of double jeopardy where appropriate.  *United States v. Urban*, 404

---

[14] The *Rush* court based its ruling on an idiosyncratic, outdated concern about the government pleading "narrative accounts" in indictments, which the court lamented "have not been discouraged by appellate courts."  807 F. Supp. at 1265-66.  Narrative indictments are now well accepted.

F.3d 754, 771-72 (3d Cir. 2005). "Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,]' will we find that a bill of particulars should have been issued." *Id*. (citations omitted). If the indictment enables the defendant to understand the accusations against him and the central facts the Government will present at trial, a bill of particulars is unwarranted. *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, [but] is instead intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985); *see also United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003). And courts have "declined to require the Government to answer a set of detailed interrogatories in the guise of a bill of particulars." *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972).

The Indictment here is highly detailed and does much more than merely track the statutory language. After identifying the named conspirators and another two

uncharged co-conspirators (William Hickman and Hayley Taff), Count 1 details the actions of the conspiracy in 41 paragraphs.  Count 1 then explains the process used for filling the fraudulent prescriptions for compounded medications and billing insurance. Ind. ¶¶ 2-12.  After the charging paragraph, 26 paragraphs describe the manner and means through which defendants obtained fraudulent compounded prescriptions.  *Id.* ¶¶ 15-41.  These paragraphs describe how defendants Johnston and Brockmeier took over Central Rexall, brought formulas for compounded medications to Central Rexall, directed the use of prescription pads with their formulas, entered into agreements with distributors, and hired defendant Casseri to manage the distributors.  *Id.* ¶¶ 16-23.  The Indictment then describes how defendants used test adjudications to design expensive but unnecessary medications.  *Id.* ¶¶ 24-30.  The Indictment then includes such details as how individuals were identified, recruited, and persuaded to receive medications; the process of completing prescriptions to obtain the highest possible reimbursement; how doctors signed prescriptions without determining that they were medically necessary or even having any relationship with the patient; how prescriptions were sent to Central Rexall; and how the fraudulent proceeds were distributed.  *Id.* ¶¶ 31-41.  "[T]he specificity with which" the Indictment identifies the time period, events, and transactions at issue make it "highly unlikely" that defendants might be "unfairly surprised with . . . unfamiliar" allegations at trial. *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012).

Count 2 incorporates those details about defendants' activities and adds six paragraphs further describing the conspiracy to commit identity theft, including seven specified overt acts.  Indictment ¶¶ 42-49.  And the money laundering conspiracy

count incorporates the detailed allegations from Counts 1 and 2 and adds five paragraphs and 29 subparagraphs identifying financial transactions defendants Johnston and Brockmeier caused to occur by date, amount, persons, and financial institution.

If, as was done here, the Government supplements a detailed charging document with substantial discovery, a bill of particulars is unnecessary. *Urban*, 404 F.3d at 772. Where "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *United States v. Caruso*, 948 F. Supp. 382, 393 (D.N.J. 1996). Presumably based on current practices of providing detailed indictments and extensive discovery before trial, Judge Hillman concluded: "'The current case law does not favor granting motions for bills of particulars.'" *United States v. Lacerda*, 2013 WL 3177814 at *14 (D.N.J. June 19, 2013) (quoting *United States v. Kemp*, 2004 WL 2757867 (E.D. Pa. Dec. 2, 2004)).

Defendants here have received extensive information in discovery, including the production of over 250 witness interviews and approximately 300,000 other documents, forming the crux of the Government's case, in January 2021, three years ago.[15] The Government organized these documents by producing party with load files, which made the documents readily accessible and searchable through a review platform. As a result, a defendant can identify and review, for example, all documents produced by Central Rexall or Boardwalk Medical LLC. The Government also

---

[15] In May 2021, the Government made a supplemental production of additional 302s and approximately 15,000 other documents, and in July 2023, the Government made supplemental productions of more 302s and approximately 5,000 other documents.

retained the original organization of the documents as produced, and so a defendant can, for example, go to the documents produced by the Pharmacy Benefits Administrator and find contracts with Central Rexall and all claims information. In the summer of 2023, the Government supplemented the January 2021 production with copies of servers and computer files produced by Central Rexall, including Defendant Casseri's laptop. Like the earlier produced materials, these materials were produced digitally with associated metadata, permitting defendants to run searches and find in seconds all documents mentioning themselves or other individuals, including, for example, all emails they sent and received from their Central Rexall email accounts.

As part of these documents, the Government has produced memoranda summarizing interviews of over 250 witnesses. These memoranda include interviews with over 100 individuals who were involved in the distribution of Central Rexall compound medications in New Jersey, including interviews of almost all of the 44 individuals who have pled guilty, along with the documents referenced in each interview. The interview memoranda include interviews of other individuals who distributed Central Rexall compound medications outside of New Jersey. And the discovery includes interviews of over 25 Central Rexall employees who worked with the defendants. Because these interview memoranda were produced in digital form, defendants can find in seconds which witnesses talked specifically about them. In addition, the Government will produce, before trial, its trial exhibits and grand jury testimony of trial witnesses.

Defendants also have an unusual advantage rarely possessed by defendants who request bills of particulars: the Government has prosecuted three trials of

individuals who distributed Central Rexall compound medications in New Jersey:
Steven Monaco, Thomas Sher, and Kaival Patel. Defendants can obtain the
transcripts of those trials and see what the Government's witnesses have said and how
the Government presented prior cases. Those trial records give these defendants an
extraordinary amount of information. Each defendant therefore has more than "that
minimum amount of information necessary to permit the defendant to conduct his *own*
investigation," *Smith*, 776 F.2d at 1111, and a bill of particulars is unwarranted.

In considering whether to grant a bill of particulars, a court also must weigh the
burden on the Government, "the government's interest in not being forced to divulge
the entirety of its case prior to trial," *Zolp*, 649 F. Supp. at 706, and "the unfairness
that can result from forcing the government to commit itself to a specific version of the
facts." *Rosa*, 891 F.2d 1066. Courts are understandably reluctant at the pretrial stage
to require a bill of particulars because it "would unfairly define and limit the
government's case." *United States v. Crabb*, 2008 WL 794871, at *3 (M.D. Pa. Mar. 24,
2008). And defendants' requests would place an enormous burden on the Government
because the requests, if granted, would compel the Government to prepare a detailed
catalogue of information found in the discovery—a task that, if it really were essential
to the defense of this case, defendants could do themselves.

In sum, the Indictment and extensive discovery here "contain[] sufficient factual
and legal information for the defense to prepare its case." *United States v. Wabo*, 290
F. Supp. 2d 486, 490 (D.N.J. 2003). As will be clear when reviewing defendants'
individual requests, they have enough information to prepare for trial, and their
request for a bill of particulars should be denied.

69

## B.    Defendants' Individual Requests

### 1.    *Each and every act Defendant Johnston took*

The Third Circuit has held that the Government need not provide a bill of particulars detailing each and every act taken by a defendant in a fraudulent scheme. In *Moyer*, the court explained that the government is not required to "identify every omission or inclusion that rendered false the documents identified in the indictment" or "'at the pre-trial stage, weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendant.'" 674 F.3d at 203. (citation omitted). Many other courts have denied bills of particulars seeking a list of details about false statements or fraudulent schemes. In *Lacerda*, for example, Judge Hillman denied a request to identify the specific misrepresentations in a fraud case, finding that the indictment detailed numerous false representations and that "the Government should not be required to disclose the specific information related to Defendants' alleged misrepresentations." 2013 WL 3177814 at *15; s*ee also United States v. Delle Donna,* 552 F. Supp. 2d 475, 498 (D.N.J. 2008) (declining to order bill of particulars seeking particulars of mail fraud theory: "the bill is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Sourlis*, 953 F. Supp. at 579-80 (rejecting request for bill of particulars seeking details about misrepresentations); *United States v. Knight*, 2013 WL 3367259, at *4 (E.D. Pa. July 3, 2013) (rejecting request for bill of particulars identifying specific material deceptions by defendant); *United States v. Qayyum*, 1998 WL 159056, *3 (S.D.N.Y. Apr. 1, 1998) (denying request for bill of

particulars identifying which of approximately 900 pharmaceutical prescriptions turned over in discovery were alleged to be fraudulent).

The Indictment and discovery give the defendants ample information about the fraud scheme to prepare for trial.  Defendants' request to compel the Government to identify specific details of the fraud scheme should be denied.

### 2.  *Identity of unindicted co-conspirators*

Defendants have no shortage of information about unindicted persons who helped distribute Central Rexall compound medications in New Jersey:  two are identified in the indictment by name; those two and another 42 have pled guilty to conspiracy to commit health care fraud and related charges; and three more went to trial.  The Government also has produced over 100 interviews of persons who played large and small roles in the distribution of Central Rexall compound medications, including interviews of almost all of the 44 individuals who have pled guilty.  And the Government has produced interviews of over 25 people who worked at Central Rexall and interviews of other people who distributed Central Rexall medicines outside New Jersey.  What the defendants really want is not to find out who was involved in their conspiracy—because they have that information in great detail from the discovery—but to obtain the Government's position about which individuals were co-conspirators or otherwise played a role in the events in this case.

The law does not require such information in a bill of particulars.  "'It is well settled that courts are 'highly reluctant to require a bill of particulars when defendants have asked for specific identities of coconspirators.'" *United States v. Smukler*, 330 F. Supp. 3d 1050, 1066 (E.D. Pa. 2018) (citation omitted).  One court

71

specifically declined the defendants' request "to require the government to make legal conclusions as to numerous individuals who were peripherally involved in this matter." *United States v. Mariani*, 7 F. Supp. 2d 556, 560-61 (M.D. Pa. 1998). Numerous other courts in this circuit have denied requests that the government identify unindicted co-conspirators or persons identified as "others" in the indictment. *See, e.g., United States v. Cook*, 2018 WL 1744682, at *2 (M.D. Pa. April 11, 2018); *United States v. Atwell*, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015); *United States v. Depiro*, 2013 WL 663303, at *5 (D.N.J. Feb. 20, 2013) (declining request for "the identify of all unindicted co-conspirators and aiders and abettors"); *Knight*, 2013 WL 3367259, at *4-5 (rejecting request to identify co-conspirators and persons identified as "others" in the indictment); *Delle Donna*, 552 F. Supp. 2d at 498 (declining request for bill of particulars identifying all persons who participated in the offenses); *United States v. Sampson*, 2012 WL 214707, at *3 (M.D. Pa. Jan. 24, 2012) (denying request because defendant had witness interviews and plea agreements of several co-conspirators); *see also United States v. Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others involved.").[16] This request should be denied as well.

---

[16] Defendants cite cases largely from outside this circuit in which courts required identification of co-conspirators. Those decisions turned on the particular facts of those cases, including the nature of the case and the extent of information provided in the indictment and discovery. The cases cited above show that, at least in this circuit, when extensive discovery has been provided, as it has been here, courts have not required identification of unindicted co-conspirators.

### 3. *Location of events*

Defendant Johnston asks for the Government to identify where all alleged acts occurred, which is not a proper use of a bill of particulars. *See, e.g., United States v. Jabali*, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied"). As is spelled out in the Indictment and the information provided in discovery, there is no secret about where things happened in this case:  defendants ran Central Rexall in Louisiana and used distributors around the country to market Central Rexall compound medications, including William Hickman and many others in New Jersey. This is not the type of case, such as a murder case, in which the defendant's location at a particular time is a crucial component of the crime. If defendant Johnston wants to know where people were when they acted, he can review the interview memoranda and the documents produced in discovery. Defendant Johnston's request for a bill of particulars to identify the location of each event should be denied.

### 4. *Other evidentiary details*

Defendants also request numerous other evidentiary details. These requests are exactly the kind of interrogatories and requests for a summary of the Government's evidence that courts have rejected. *See, e.g., United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972); *Depiro*, 2013 WL 663303 at *5. A bill of particulars "'is not designed to compel the government to detailed exposition of its evidence.'" *Delle Donna*, 552 F. Supp. 2d at 498 (citation omitted). A request for the "when, where and how" of particular acts is "tantamount to a request for 'wholesale

73

discovery of the Government's evidence,' which is not the purpose of a bill of particulars under Fed. R. Crim. P. 7(f)." *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975). Defendants are not entitled to a bill of particulars listing these evidentiary details. And, as is explained below, the defendants have detailed information in the extensive discovery that has been provided about the particular types of information they seek.

### a. Claims data

The Government has produced extensive data sets from the Pharmacy Benefits Administrator and Central Rexall showing which claims were submitted, which were paid, and which were rejected.

### b. Prescription pads and formulas

The Government has produced all of the pre-printed prescription pads it received from Central Rexall and from the distributors, such as William Hickman, who used those pads. The Government also has produced completed prescriptions using those pads from Central Rexall, distributors, and doctors, to the extent those prescriptions are in the Government's possession. The formulas that Central Rexall used are contained in those pads, and the formulas under consideration are discussed in Central Rexall internal documents, communications with distributors, and witness interviews.

### c. Agreements with distributors

The Government produced agreements with distributors that are in its possession via its productions of Central Rexall documents and the documents obtained from distributors, such as William Hickman. If those distributors were

74

interviewed by the prosecution team, the Government has produced memoranda of those interviews.

d.    Test adjudications

The Government has produced Central Rexall documents and interview memorandum discussing test adjudications.  The Government also has produced claims data in its possession.

\* \* \*

In sum, Defendants have more than enough information to investigate this case and prepare their defense.  For three years, they have had the Central Rexall documents that the Government had when it obtained the Indictment, along with documents obtained from distributors, doctors, patients, and many others.  Defendants also have had reports of hundreds of witness interviews, including interviews of Central Rexall employees and distributors from New Jersey and elsewhere.  The Government has supplemented its initial discovery production with additional documents as they have become available, including Central Rexall servers and other computer files produced in August 2023.  Their requests for a bill of particulars should be denied.

## X.    THE DEFENDANTS SHOULD BE ORDERED TO PRODUCE RECIPROCAL DISCOVERY AND PRIOR DEFENSE WITNESS STATEMENTS.

As set forth in Rule 16(b), upon complying with a request by a defendant for similar material, the Government may "[i]nspect and copy or photograph books, papers, documents, photographs, tangible objects . . . which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as

evidence in chief at trial." Fed. R. Crim. P. 16(b). Similarly, Rule 26.2 calls for the

production of written or recorded statements of any witness a defendant intends to call

to testify at trial.

The Government fulfilled its discovery obligations in this case and is entitled to

reciprocal discovery. To date, the Government has received no discovery from the

defendants. The Government is entitled to this information, and the Court should

direct the defendants to immediately produce reciprocal discovery and produce any

written or recorded statements of potential witnesses they intend to call at trial at the

time of *Jencks* disclosures.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendants' pretrial

motions in their entirety and grant the Government's motion for reciprocal discovery

and witnesses' prior statements.

Respectfully submitted,

VIKAS KHANNA
Attorney for the United States

By:    R. DAVID WALK, JR.
DANIEL A. FRIEDMAN
Assistant United States Attorneys

Dated: January 24, 2024

76

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on this day I caused to be served, via the Court's Electronic Filing System ("ECF"), a copy of the Brief of the United States in Opposition to Defendants' Pretrial Motions and In Support of Its Motion for Reciprocal Discovery on all defense counsel of record.

Respectfully submitted,

VIKAS KHANNA
Attorney for the United States

R. DAVID WALK, JR.
DANIEL A. FRIEDMAN
Assistant United States Attorneys

Date: January 24, 2024